## APPENDIX A – FACTUAL BACKGROUND

A.     *Shipp Was an At-Will Employee of Time Warner Cable and Charter Who Knew the Various Ways in Which She Could Complain about Alleged Unlawful Conduct.*

Charter Communications, Inc. is a broadband communications company providing video, Internet, and voice services to residential and business customers. On May 18, 2016, Charter officially merged with Time Warner Cable. Ex. 4, Zimmerman Decl. at 2, ¶ 5. At all times relevant to this lawsuit, both Time Warner Cable and Charter maintained employment-at-will policies and have employed their workforces on an at-will basis. Ex. 18, Standards of Business Conduct at D-SS-000378; Ex. 19, Acknowledgment. Similarly, both companies maintained policies prohibiting discrimination based on sex, age, and other protected characteristics, including throughout the year of 2016. *See* Ex. 1, Pl. Dep. 100:22-102:21; Ex. 18, Standards of Business Conduct at D-SS-000382; Ex. 20, EEO Policy; Ex. 21, FMLA Policy.

Employees, like Plaintiff Stephanie Shipp, thus could report any suspected unlawful discrimination, harassment, or retaliation through any number of avenues, including through the Law Department, the Human Resources Department, the Ethics Department, or the Employee Relations Department. *See* Ex. 18, Standards of Business Conduct at D-SS-000382; Ex. 20, EEO Policy; Ex. 21, FMLA Policy. However, the Employee Relations Department is the specific department listed in the applicable EEO Policy as handling complaints arising thereunder. Ex. 20 EEO Policy. The Employee Relations Department is thus the one that, at least in 2016, handled any investigations pertaining to any EEO-covered complaints. Ex. 4, Zimmerman Decl. at 7 ¶ 9(c).

Employees like Shipp also learned about the company's various employment policies through multiple sources. These sources included, but were not limited to, bulletin board postings in work facilities, copies of policies available on the company's intranet, and training courses offered. Ex. 4, Zimmerman Decl. at 10-11, ¶ 10(d). For her part, Shipp received training on these

policies throughout her employment tenure, and she was at all times she could access any policies at any time via the company's intranet system. Ex. 1, Pl. Dep. at 102:2-21; *see also* Ex. 22, Shipp Training Transcript (reflecting online training Shipp received during her employment tenure); Ex. 34, Matthews Training Transcript (reflecting online training Matthews received during his employment tenure).

**B.      *Due to a New Company-Wide Initiative, Shipp Moved under a New Manager in January 2016 But Continued to Hold Same Job Title and Perform Same Job Duties.***

Shipp began her employment, originally with Time Warner Cable, in March 2010. Ex. 3, Job History Report. Shipp started out as an Account Consultant, but by 2014, she became a Major Account Executive ("MAE"), which was a non-management commercial sales representative position in the company's hospitality sales group. Ex. 1, Pl. Dep. 104:1-3, 12-23. During 2014, Shipp began reporting to Manager Steve Johanknecht, and she continued reporting to him until January 2016. Ex. 3, Job History Report. Until January 2016, Johanknecht's hospitality sales team consisted solely of Major Account Executives like Shipp. Ex. 23, Johanknecht Dep. at 37:23-24.

Beginning in the fall of 2015, both as a matter of course, but also in preparation for the upcoming Time Warner Cable-Charter merger, many changes began to take place. Ex. 4, Zimmerman Decl. at 2, ¶ 5; *see* Ex. 1, Pl. Dep. 257:-10-258:7. One change that was instituted effective January 22, 2016 was the reorganization of the Texas hospitality sales teams. *Id.* at ¶ 5(a). Previously, the teams were divided between Johanknecht who oversaw the Major Account Executives and Chris Matthews who oversaw Account Managers. *Id.*; Ex. 23, Johanknecht Dep. 41:1-7; Ex. 12, Matthews Dep. 24:3-23. Effective January 2016, the company decided to split the sales teams geographically instead. Ex. 4, Zimmerman Decl. at 2, ¶ 5(a). As a result, Johanknecht took over the supervision of both Major Account Executives and Account Managers, but only those servicing the North Texas areas. *Id.* As for Matthew, he on the other hand took over the

supervision of the Major Account Executives and Account Managers who serviced Central and South Texas. *Id*.

This reorganization was part and parcel with an even broader initiative and one that involved changing the way the company approached the sales market as a whole. *Id*. at 3, ¶ 5(b).  That initiative resulted ultimately in both Major Account Executives and Account Managers being assigned specifically, defined geographic territories. *Id*. The rules under which these sales representatives operated thus changed as well throughout 2016.[1] *Id*. at ¶ 3. For instance, sales representatives could no longer sell statewide or even outside their smaller geographic territories based on a lead from a referral partner. *Id*.

**C.   *Shipp Dislikes the New Sales Rules and Struggles with the Administrative Part of Her Duties, Which Leads to Conflicts with New Manager.***

Although Johanknecht generally considered Shipp an acceptable performer, he did encounter problems with her performance in 2015. As he noted on her performance evaluation, she failed to return customer calls at times and needed to do a better job of handling customer

---

[1] Shipp's husband, Danny Shipp, who also worked with Time Warner Cable, although in a different sales department, confirmed that major restructuring changes were ongoing in all the departments in the lead-up to the merger in 2016.  Ex. 7, Danny Shipp Dep. at 34:11-14. As he testified:

> "Our whole sales model shifted. … There was a lot of account restructuring …[T]hings that we normally could sell within the guidelines of my business sector, which was the small medium business, were all changed. They took away the ability to sell fiber in our department, it had to go into either MAE or enterprise. They just dissected the entire sales model, and it hit me directly because the way that the place worked was if you could not be extremely secretive about the business that you were writing, somebody in that office via Salesforce would own your accounts. We did not have Salesforce police, so it was up to you to guard your accounts and to guard your business, and there wasn't a lot of support during that because of the five and five program going on. They didn't care who wrote the business, they didn't care how much business you wrote, as long as it was all new and it got them towards that 5 billion in five years platform, that's what all that was about."

*Id*. at 32:20-34:10.

issues so that they did not escalation to upper management. Ex. 26, 2015 Perf. Evaluation; *see* Ex. 23, Johanknecht Dep. 47:14-16, 100:6-19 ("[W]e had several escalations where she wasn't returning phone calls, and it either got above me to my director and then I had to hear about it from him."). Johanknecht also pointed out that Shipp needed to focus on keeping her sales opportunities updated with the company's Salesforce system and generating additional leads and opportunities, related to the company's Navisite product. Ex. 26, 2015 Perf. Evaluation. Notably, Shipp did not contest the last performance evaluation provided by Johanknecht, which included ratings that ranged from "do not meets expectations" to "exceed expectations" and an overall rating of "successfully meets expectations." Ex. 26, 2015 Perf. Evaluation.

During the time that Shipp reported to Johanknecht, he viewed Shipp as either uninterested or unable to perform the administrative functions of her Major Account Executive position. Ex. 23, Johanknecht Dep. at 43:7-12. Nevertheless, instead of forcing the issue, Johanknecht decided to complete administrative functions for Shipp, which included tasks like completing sales surveys. Ex. 1, Pl. Dep. at 166:1-18. That was by Johanknecht's own choice and stood in contrast to Matthews, who believed sales representatives within one of the nation's largest technology companies needed to perform his or her own administrative functions. As Shipp explained,

> "[Matthews] wanted us to – to do it [referring to administrative functions]— Chris [Matthews] came from an account manager manager. That's what he was. Before he was my manager, he was an account manager manager. So the people that he managed, all they did was changes [to the contracts] all day long. They didn't do new business. They just did changes. So in his mind, everybody should know how to do it."

Ex. 1, Pl. Dep. at 194:10-16. Matthews' perspective, however, was not out of line, as the company expects sales representatives in general too perform all essential job duties, including any administrative or technical tasks. Ex. 10, Lawrence Dep. at 99:6-14.

Although Shipp contests such now, Debbie "Sunny" Broam, a friend and former co-worker of Shipp, confirmed that Shipp struggled with using Salesforce throughout her employment. Ex. 13, Broam Dep. at 88:19-89:19. Some of Shipp's other co-workers, as well as Matthews himself, also observed Shipp encountering difficulty with creating contracts and abiding by quality control requirements. *See* Ex. 12, Matthews Dep. 41:9-24; Ex. 27, Layman Dep. 11:8-12:15, 13:5-18; *see also* Ex. 15, Castano Dep. 12:12-25 (testifying that before he became a salesperson, he worked in sales support, and recalls "going above and beyond" for Shipp in terms of "managing agreements, and – and stuff that are action items that were needed, such as approvals or something along those lines, that a sales rep was supposed to obtain, I would assist in obtaining those approvals where I wouldn't necessarily do that with other sales reps."). For her part, Shipp stated—both internally and externally—back in 2016 that she struggled with completing the weekly sales forecasting spreadsheets that Matthews required of all his sales representatives and overall with handling the technical aspects of her job. *See* Ex. 10, Lawrence Dep. at 59:9-61:18 (confirming Johanknecht told her Shipp struggled with the technical aspects of her job and explaining that Shipp herself advised her March 2016 that "she was not technical" and needed training to assist with the weekly spreadsheets); Ex. A to Pl. Compl. (Dkt 1 at 16), EEOC Charge (claiming Matthews would not provide her "with training that I needed to use his spreadsheets that he required the sales staff to use, without exception); Ex. 15, Castano Dep. at 50:8-53-8, 54:22-55:21, 56:6-7, & 57:25-25:19 (explaining that all members of Matthews' sales team had to complete the weekly spreadsheets, which were better for projections and reporting than the company's Salesforce system, and that he personally observed Shipp struggling with the weekly spreadsheet). Unfortunately, these struggles continued throughout Shipp's time reporting to Matthews in 2016. *Id.*

**D.** **Shipp Takes Two Weeks of FMLA Leave at End of January 2016.**

Although Shipp believes her transfer to Matthews' sales team occurred over the Christmas holidays in 2015, according to her former manager and her official Job History Report, she was actually transferred to Matthews' sales team effective January 22, 2016. *See* Ex. 23, Johanknecht Dep. at 56:2-5; Ex. 3, Job History Report. Nevertheless, there is no dispute that, in January 2016, that Shipp took nine days of FMLA leave when she was hospitalized with meningitis. Ex. 1, Pl. Dep. at 108:18-109:1; Ex. 3, Job History Report. As far as Johanknecht recalls, however, Shipp was still reporting to him while she was on FMLA leave. Ex. 23, Johanknecht Dep. 55:9-56:5. But, whether Shipp reported to Johanknecht or Matthews for these nine days is immaterial; importantly, Shipp does not claim she was deprived of any additional FMLA leave needed in January 2016 or anytime thereafter.  Ex. 1, Pl. Dep. at 109:7-110:5.

**E.** **Immediately Upon Return from Leave, Shipp Begins Complaining about Matthews, But Not in Terms of Unlawful Discrimination, Harassment, or Retaliation.**

Within days of her returning from FMLA leave, and despite not reporting to Matthews for very long at all, Shipp began raising concerns about Matthews to the company's Human Resources Department. In particular, she called Human Resources Director Tamara Zimmerman on February 9, 2016 and complained about reporting to Matthews because he was, in Shipp's mind a "bully" and had a "his way or the highway attitude." Ex. 36, Feb. 9-15, 2016 Emails. At the same time, however, Matthews himself reached out to Human Resources Managers Kristine Lawrence and Linda Olsen, as well as Director Zimmerman about an account split Matthews and Johanknecht jointly had decided not to grant to Shipp, Shipp advising others that she was recording conversations with Matthews, and Shipp complaining to Johanknecht about Matthews and some referral. *Id.* In light of both concerns, Zimmerman asked Lawrence to look into the situation further.  *Id.*  Notably, in doing so, Zimmerman specifically advised Lawrence that she did not

consider Shipp's concerns to fall within the purview of the Employee Relations Department. *Id.*;
Ex. 4, Zimmerman Decl. at 6-7, ¶ 9. Zimmerman also shared with Lawrence that Shipp, for her
part, was still deciding whether she wanted to proceed with any concern. Ex. 36, Feb. 9-15, 2016
Emails; Ex. 4, Zimmerman Decl. at 6, ¶ 9(a).

Over the next month, both Lawrence and Zimmerman communicated with Shipp and
Matthews. As became apparent, the conflict between them derived from Shipp's reluctance to
accept the differing management style Matthews had in comparison to Johanknecht and the various
company-wide changes Mathews had to implement both with Shipp and others on his sales team.
*See* Ex. 36, Feb. 9-15, 2016 Emails; Ex. 37, March 2016 Emails & Notes from Lawrence's
File.  However, at no time during these communications did Shipp ever mention or suggest that
she believed Matthews was treating her differently compared to her co-workers or discriminating
against her because of her gender, age, or use of two weeks of FMLA leave in January 2016. *See*
Ex. 36, Feb. 9-15, 2016 Emails; Ex. 37, March 2016 Emails & Notes from Lawrence's File; Ex.
4, Zimmerman Decl. at 6, ¶ 9(a); Ex. 28, Lawrence Decl. 2, ¶ 4.

One specific concern that did come to light in these communications pertained to a couple
of sales accounts or opportunities that Shipp believed should have been given to her and not. The
first pertained to lead from a referral partner that, according to Shipp, Matthews had given to a
female sales representative on an entirely different sales team. Ex. 37, March 2016 Emails & Notes
from Lawrence's File. As was explained to Shipp on more than one occasion, under the company's
new Rules of Engagement and Territory Management Initiative, she no longer could work leads
for sales outside her geographic area, and the only reason she could not work this particular lead
was because it fell outside of Shipp's geographic area. *See id.*; Ex. 4, Zimmerman Decl. at 2, ¶

5(a); *see also* Ex. 11, Rules of Engagement § 2.1 (outlining the sales rules and guidelines applicable to leads or opportunities obtained from business referral partners).

The other sales account related concern pertained to a one-time event Matthews had not assigned to Shipp. Ex. 9, Mar. 15-16, 2016 Emails. Although Shipp acknowledged in her email to Lawrence that the one-event was not one she had located, had worked, or had been assigned previously, she believed Matthews still should have assigned it to her instead of Hector Castano, a new Major Account Executive on Matthews' sales team. *Id.* She even claimed such despite acknowledging that Castano was "at ramp," which meant Matthews had an obligation to funnel sales accounts and opportunities his way, and that she was at "full quota." *Id.* She also acknowledged in her email that there was another one-time event for which Matthews fought for her to keep. *Id.* Thus, even from Shipp's email itself it is apparent her concern had no basis and that Matthews had completed legitimate, non-discriminatory reasons for providing the one-time event to Castano. *Id.* This in fact was explained in Lawrence's response back to Shipp. *Id.*

Importantly, in her response, Lawrence reminded Shipp that, if she disagreed with the decision on the account assignment, her remedy was to use the open door process and request Matthews' Director, Marc Newhaus, review the situation. *Id.* Lawrence's reminder was consistent with the Rules of Engagement in place at the time, which contained a conflict resolution process that sales representatives were to follow if they had any concerns about their account assignments. Ex. 11, Rules of Engagement § 9.0. Significantly, Shipp never once used that process to complain about any sales account or opportunity she claim Matthews should have assigned to her or had reassigned away with her. Ex. 4, Zimmerman Decl. 10 at ¶ 10(c). Shipp also never once mentioned to Lawrence or Zimmerman that she felt Matthews' handling of account assignments was

discriminatory in any way, be it based on gender, age, or use of FMLA leave. Ex. 4, Zimmerman Decl. 11 at ¶ 11; Ex. 28, Lawrence Decl. 2-3 at ¶ 5.

**F.      *HR Manager Holds Satisfactory Mediation with Shipp and New Manager in April 2016.***

To help resolve the conflicts that had arisen between Shipp and Matthews, Lawrence offered to hold a mediation session, wherein she appeared by phone while Shipp and Matthews met in person. Ex. 28, Lawrence Decl. 3 at ¶ 6. That mediation occurred on April 5, 2016. *Id.* at ¶ 7.  During the session, Lawrence helped guide the discussion between Shipp and Mathews by using a prepared agenda. Ex. 35, Agenda & Lawrence's Mediation Notes.  As that agenda and Lawrence's notes from the session reflect, the goal was to allow Matthews an opportunity explain his expectations and Shipp an opportunity to ask questions and identify anything she needed to meet his expectations and be successful in her role. *Id.*  According to the agenda, Matthews also reviewed with Shipp how one-time events would be handled.  *Id.*  He also explained to Shipp that accounts now had to be assigned based on geography, and that contrary to Shipp's contention, the company owned all sales accounts, not any individual sales representative. *Id.*  Although Shipp did have an outstanding question about "keep accounts," upon which Lawrence followed up and responded the following day, it appeared to Lawrence that the session sent well.  Ex. 29, April 5, 2016 Email re Keep Accounts. Shipp in fact told Lawrence that she was "satisfied" at the end of the session. Ex. 1, Pl. Dep. at 254:23-255:7; Ex. 28, Lawrence Decl. 3 at ¶ 7.

Critically, Shipp never reached out to Lawrence again after this mediation session. Ex. 28, Lawrence Decl. 3 at ¶ 7.  She likewise never raised any concerns to Zimmerman about Lawrence or her handling of Shipp's concerns raised in February, March or April 2016.  Ex. 4, Zimmerman Decl. 8 at ¶ 9(g). Similarly, Shipp did not complain, at any time, to the Employee Relations Department or any other Human Resources official, be it about Matthews or any belief she may

have had that Matthews had engaged in any discriminatory or harassing behavior. *Id.* at 10 ¶ 10(d). Shipp's sole complaint thereafter was about a personal Facebook post upon which Matthews had commented back in September 2015, before he became Shipp's manager. Lawrence Decl. at 3 ¶ 8. Shipp specifically complained to the Ethics Department about the post. *Id.* The Ethics Department thus reviewed the matter and directed Lawrence in the end to speak with Matthews about the post. *Id.* at 4 ¶ 9. The Ethics Department also sent an email to Shipp advising her that Lawrence would be speaking with Matthews about the matter. Notably, based on past company practice and policies at the time, further disciplinary action was not warranted, particularly since it concerned a personal Facebook post. *Id.*

**G.** ***Shipp Voluntarily Resigns in June 2016 to Accept Position with a Direct Competitor.***

Although Shipp struggled with her administrative and technical tasks, she received no discipline from Matthews at any point in time. Ex. 1, Pl. Dep. 145:4-7; Ex. 12, Matthews Dep. 76:4-5. Matthews likewise never once threatened her with being fired or asked her to quit or retire. Ex. 1, Pl. Dep. at 145:11-23. 150:5-12 & 292:2-293:7. Nevertheless, without exhausting all internal complaint avenues available first, Shipp notified Charter, in the very early morning hours of June 7, 2016, that she was resigning her employment. Ex. 6, Resignation Ltrs. Shipp submitted this resignation via two separate emails. *d.*

The first email was addressed to Mathews and copied Lawrence and Zimmerman. *Id.* In that email, Shipp merely indicated that she had decided to accept a position with a competitor, which she in fact did, Comcast. *Id;* Ex. 8, Comcast Records. Although Shipp said she reached the decisions to resign "after long hours of consideration and sleepless nights," she provided no other context to her decision to resign. Ex. 6, Resignation Ltrs.

At the exact same time as her first email, Shipp somehow managed to send a second longer email, this time addressed to Zimmerman with a copy to Lawrence. *Id.* Shipp opened her email by

reiterating that she was going to work for a competitor.  *Id.* However, she went on to express a host of generic complaints about Matthews that either had no merit (such as referencing employees quitting although they still worked with Charter) or were merely a repeat of complaints Zimmerman and Lawrence knew had been addressed two months prior (such as the Facebook post). *Id.* Additionally, Shipp provided no specifics as to any recent conduct or behaver exhibited by Matthews, other than a reference to a singular sales account or opportunity allegedly transferred to Castano the week prior.[2]  *Id.*

Charter, in accordance with its typical procedures, paid Shipp her for her two work notice period, thereby making her effective last day June 22, 2016. Ex. 3, Job History Report.  Shipp did not work during this notice period because, consistent with its practice, Charter does not allow employees leaving for a competitor to do so.  As it turned out, Shipp went to work for Comcast as a National Account Manager, which was a promotion and provided a $40,000 increase over her final base pay with Charter. Ex. 1, Pl. Dep. at 38:10-15. According to Johanknecht, Shipp also told him that, while she was "sad that she was leaving [Charter]," she was "excited that she had this new opportunity [at Comcast], more base salary, ability to make more money." Ex. 23, Johanknecht Dep. at 68:8-12. Remarkably, Shipp also engaged in one last act of misconduct—she provided her "book of business" that she had with Charter to her new employer and Charter's known direct competitor, Comcast. Ex. 7, D. Shipp Dep. 92:2-93:9.

---

[2] Shipp made no mention in her email as to whether she had used the open door process on the Rules of Engagement conflict resolution procedure to address any concern she may have had regarding this single account, which would have been the proper channel.  *Id.* Through discovery, it now appears that the sales account to which Shipp vaguely references may be the HOHM account identified as having been transferred from Shipp to Castano on May 24, 2016. However, as the company discovered, this account likely pertained to a national sales account, which involves different sales personnel, but regardless never resulted in any sale or commission to Castano. Ex. 16, Chart of Accounts Allegedly Transferred.  In other words, Shipp suffered no economic harm from the transfer of this account.