# EX. 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STEPHANIE SHIPP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 1:18-cv-00760-LY |
| | § | |
| | § | |
| CHARTER COMMUNICATIONS, INC. | § | |
| | § | |
| Defendant. | | |

## DECLARATION OF TAMARA ZIMMERMAN

My name is Tamara Zimmerman. I am over 18 years of age, of sound mind, and am competent and capable of making this declaration. The facts stated herein are within my personal knowledge and are true and correct.

1. I am currently a Senior Director of Human Resources for Charter Communications, Inc., which is a national broadband communications company providing video, Internet, and voice services to residential and business customers. I have been employed with either Charter or its predecessor, Time Warner Cable, for a total of eleven years. In 2016, I served as the Human Resource Director supporting Time Warner Cable's Business Class sales organization, which included at that time Plaintiff Stephanie Shipp, her Manager Chris Matthews, and the remainder of Mr. Matthews' hospitality sales team.

2. In May 2016, I was promoted to my current position of Senior Director of Human Resources. My title later changed in 2016 following the merger between Time Warner Cable and Charter to Human Resources, Senior Director for Spectrum Enterprise. My duties, however, remained the same throughout the remainder of 2016. Human Resources Manager Kristine

Lawrence also continued to report to me throughout 2016, and she too provided human resources support to the Texas hospitality sales teams.

3. On September 18, 2019, I provided corporate representative deposition testimony on certain topics noticed by Ms. Shipp's counsel, including as it pertains to Ms. Shipp's employment circumstances from January to June 2016.

4. Throughout Ms. Shipp's five and half year employment tenure, both Time Warner Cable and Charter maintained employment at-will policies. Ms. Shipp, like all other employees, was thus employed at-will by both Time Warner Cable and Charter. Additionally, Ms. Shipp, along with Mr. Matthews and her fellow co-workers, were subject to Time Warner Cable's EEO Policy and Standards of Business Conduct. Both policies remained in effect throughout 2016, even in light of the May 2016 merger with Charter.

5. In 2016, many company-wide changes occurred as a matter of course and in the lead up to the closing of the May 2016 Time Warner Cable-Charter merger.

    a. One change that impacted Ms. Shipp was how sales teams were formed. Prior to January 2016, Texas had two hospitality sales teams, one that consisted of Account Managers reporting to Chris Matthews and another that consisted of Major Account Executives reporting to Steve Johanknecht. Effective January 22, 2016, these Texas hospitality sales teams were reorganized, however, to focus on geographic areas, not job positions. As a result, Mr. Johanknecht, who was based in Dallas, Texas, became the manager of all hospitality Account Managers and Major Account Executives servicing North Texas, while Mr. Matthews, who was based in Austin, Texas, became the manager of all hospitality Account Managers and Major Account Executives servicing Central and South Texas.

    b. This reorganization that took place in 2016 was part of an overall company-wide Territory Management Initiative (also known as TMI). TMI was considered a complete change in the way the company approached or went to market. For instance, before TMI, sales representatives could service clients with no geographic limitation, but after TMI, sales representatives were limited to a specific geographic territory. That was the very case with Ms. Shipp. Before TMI, she could sell anywhere she had contacts, but after TMI, she could only sell within her defined Central Texas geographic territory, which was set by a group known as Territory Management that fell within the company's Sales Operations Department.

    c. Another similar change that took place concerned referral partners. Before TMI, a sales representative could obtain a lead from a referral partner and work towards a sale even if the sale was outside the geographic area within which the sales representative typically worked. After TMI and resulting changes to the applicable Rules of Engagement—which are the general guidelines applied to guide sales activities and resolve disputes amongst sales representatives—a sales representative could only work a lead from a referral partner if the sale would fall within his or her defined geographic territory. For example, as I explained to Ms. Lawrence in March 2016, if a referral partner sent Ms. Shipp a sales lead, but the lead fell outside her Central Texas territory, she could no longer work the lead and had to pass it on to a sales representative in the geographic territory where the sale and installation would occur.

6. Whether before or after TMI, no individual sales representative has ever "owned" a sales account or a sales lead (often referred to as a sales opportunity). Instead, according to the

company's policies and practices throughout my tenure, sales accounts and opportunities belong to the company as a whole. In this regard, the company reserves the right and discretion to move sales accounts and opportunities as business needs dictate.

    a. In 2016 and continuing through today, the company's Sales Science team, a subset of the Sales Operations Department, is responsible for reviewing from time to time sales modules, which include a mix of sales accounts and sales opportunities provided to an individual sales representative, to determine if the modules contain appropriate distributions based on sales representatives' position, tenure, and geographic territory. If any unequal distributions are discovered, Sales Science redistributes the sales accounts and opportunities in a way that fits the company's overall sales objectives and territory alignment.

    b. In 2016, sales managers also had the ability to shift sales accounts and opportunities amongst team members based on business needs. A business need could range anywhere from needing to resolve a customer complaint or having to ramp up a newly hired sales representative or an existing sales representative whose quota had increased, to a lack of activity by the currently assigned sales representative. Sales managers also can move sales accounts and opportunities when a sales representative takes a leave of absence, such as one under the FMLA. Typically, in that circumstance, accounts are moved only if the leave is an extended one, a customer need must be addressed, or a sales deal can be closed. However, when the sales representative returns from leave, the transferred sales accounts or opportunities are usually, but not always, returned to the sales representative. A sales account or opportunity may not be returned, for instance, where the customer

prefers to work with the new sales representative, an inequitable distribution of accounts would result, a sale is nearing closure, or he previous sales representative never substantively acted on the account or opportunity before the leave of absence.

7. Each sales representative is assigned a specific sales quota. That quota is not determined by the sales management team, but rather Sales Science. Sales Science, not the sales management team, also decides whether any quota relief is warranted if a sales representative takes a leave of absence. Territory Management, not the sales management team, determines how many Major Account Executive and Account Manager job positions should serve a given geographic territory.

8. The essential duties and functions of a Major Account Executive and Account Manager are largely the same. The primary difference is the amount of their sales quotas, as an Account Manager is focused more on existing customers while a Major Account Executive focuses on obtaining new customers.

   a. In early 2016, Hector Castano, another member of Mr. Matthews' hospitality sales team, went through a posting and selection process to move from an Account Manager 2 to a Major Account Executive. Mr. Castano was selected for the then-vacant Major Account Executive position in February 2016.

   b. In April 2016, two members of Mr. Matthews' hospitality sales team, Allison Savage and Debbie Broam moved from Major Account Executives to become Account Manager 2s. Their move bore no relation to Mr. Castano's February 2016 job change and was primarily driven by Territory Management, and providing both, who had struggled with performance, a lower quota that was easier to achieve. Neither their ages, gender, nor use of FMLA leave was a factor.

9. Turning back to Ms. Shipp, she at no time raised any concerns to me about her being discriminated against or treated differently based on her gender, age, or use of FMLA leave. Instead, her concerns, as expressed directly to me, revolved around her not wanting to leave her prior manager, Mr. Johanknecht, the type of administrative tasks her new manager, Mr. Matthews, required, and other company-wide changes that altered the way Ms. Shipp had engaged in sales activities before 2016.

   a. The first time I recall being contacted or notified about any issue between Ms. Shipp and Mr. Matthews was on or around February 9, 2016. I received a call from Ms. Shipp who advised me that she wanted to stay on Mr. Johanknecht's team because she did not like reporting to Mr. Matthews, whom she considered a "bully." During this first phone call, however, Ms. Shipp did not raise any concerns to me about Mr. Matthews treating her differently in comparison to her co-workers or based on her gender, age, or prior use of FMLA leave, as I indicated in my subsequent email. Ms. Shipp also wanted to think about whether she wanted me to contact Mr. Matthews or his leader and asked no specific action be taken in the meantime.

   b. On or around this same day, Mr. Matthews alerted myself and Ms. Lawrence via email to concerns that had arisen in connection with Ms. Shipp. One particular concern pertained to a commission split for a sales account that Mr. Matthews decided to change from 50% to Ms. Shipp and 50% to another employee, Corey Dickey, to 100% to Mr. Dickey. According to the email, Ms. Johanknect and Mr. Matthews made this decision because Ms. Shipp did not follow through on her tasks related to the sale. Based on my experience working with this sales organization and knowledge of the company's overall policies and practices, this decision was

consistent with other how other similar situations had been handled. Notably, Ms. Shipp did not complain in our first phone call about her not receiving 50% commission for this particular sales account, nor did she suggest at the time that Mr. Matthews was transferring sales accounts or opportunities away from her to younger or male employees.

c. In light of Mr. Matthews' February 9, 2016, email, I shared with Ms. Lawrence the content of my first phone call with Ms. Shipp. In doing so, I mentioned that "there have been behavior issues with Chris and women in the past." This reference, however, was a poor word choice, as it solely pertained to highly profitable sales employee, Fran Zucaro. Some years prior, and before Ms. Lawrence began supporting the Texas hospitality team in 2016, Ms. Zucaro's new manager had complained to my previous direct report (who was no longer with the company in 2016) about Mr. Matthews visiting Ms. Zucaro's home in an attempt to convince her to stay on his sales team. As far as I was aware, Ms. Zucaro did not herself raise any complaint concerning Mr. Matthews, nor did her manager's concern involve any claim that Mr. Matthews had treating Ms. Zucaro differently or inappropriately based on her gender. I can say such affirmatively, because if such a complaint had been made, I would referred it to the company's Employee Relations Department, which is the department responsible for investigating any type of EEO concerns, including concerns of gender or age discrimination or FMLA retaliation.

d. On or about February 15, 2016, I reached out to Ms. Shipp to advise her that Ms. Lawrence would be assisting her with any concerns going forward. Ms. Shipp did not raise any concerns to me about Mr. Matthews treating her differently in

comparison to her co-workers or based on her gender, age, or prior use of FMLA leave during this second communication.

e. On or about March 9, 2016, I received another phone call from Ms. Shipp. This time, Ms. Shipp complained, not only about Mr. Matthews allegedly being a "bully" and a "jerk," but also about his "style being different than hers" and his desire for her to "step out of her style." Ms. Shipp additionally complained about Mr. Matthews telling her she should know how to do certain administrative tasks. Ms. Shipp, however, did not raise any concerns to me about Mr. Matthews treating her differently in comparison to her co-workers or based on her gender, age, or prior use of FMLA leave during this third phone call.

f. Another concern Ms. Shipp raised during this third phone call was about her inability to use referral partners. I explained to Ms. Shipp in response that the 2016 change in how sales representatives could use of referral partners was made at a high level well above Mr. Matthews and coincided with the company's new overall approach to territory alignment. In other words, the decision was one implemented company-wide and was not something Mr. Matthews only applied to Ms. Shipp.

g. Ms. Shipp and I had no further telephone calls after March 9, 2016. Ms. Shipp also did not contact me again until she sent two emails regarding her resignation from employment at 2:17 a.m. on June 17, 2016. Ms. Lawrence, however, kept me generally updated on her discussions with Ms. Shipp and Ms. Matthews. Based on those updates, I understood a mediation session was held on April 5, 2016, and that beyond a complaint Ms. Shipp made directly to and handled by the Ethics

Department around that same time, no further complaints were brought to Ms. Lawrence's attention after that session.

10. When I received Ms. Shipp's two resignation emails on June 7, 2016, I accepted her representation that she was joining a competitor. Although Ms. Shipp was paid her two-week notice period, because she was leaving to work for a competitor, her employment physically ceased on the day she sent her two resignation emails.

   a. In one of those emails, Ms. Shipp identified four employees who she claimed left the company because of Mr. Matthews. I have no recollection regarding any such concerns from those employees, and I have found no records reflecting any such concerns by those employees. I also did not give much weight to Ms. Shipp's contention because three of the four employees she identified were still employed with Charter at that time.

   b. As for Ms. Shipp's reference to a Facebook comment Mr. Matthews had made in one of her two resignation emails, I was aware the company's Ethics Department had previously reviewed and addressed the situation by directing Ms. Lawrence to speak to Mr. Matthews (and Mr. Seybold). From my knowledge, the direction provided by the Ethics Department was consistent with the company's policies and practices at the time practice, as Mr. Matthews' comment on his personal Facebook page, while of bad taste and an inappropriate nature, did not then warrant the issuance of formal corrective action.

   c. I also did not take Ms. Shipp's reference to an account being transferred to another salesperson, Hector Castano, as reflecting any-EEO type of concern. I myself was not aware of Mr. Castano's age at the time or whether he had ever taken FMLA

leave himself. Ms. Shipp likewise did not mention in her resignation email that his age or absence of FMLA leave was the reason for his preferential treatment. Moreover, although she claimed to have written "me and Mr. Matthews about the particular account transferred, I did not recall her doing so, but even if she had, I was not the appropriate person to whom to complain. Rather, as stated in our Rules of Engagement, there was a specific process Ms. Shipp could use to address any disputes involving sales accounts or opportunities. To my knowledge, Ms. Shipp never utilized this process prior to or at the time of her resignation from employment.

d. Although Ms. Shipp mentioned towards the end of one of her two resignation emails that "No manager should be able to talk to women the way [Mr. Matthews] does," I did not consider her comment to raise a complaint of gender discrimination that needed to be referred to our Employee Relations Department. As I knew from my direct interactions with Ms. Shipp as well as the regular updates I received from Ms. Lawrence, Ms. Shipp had complained previously about Mr. Matthew's being a "bully" and a "jerk". However, those complaints, as far as I was aware, had been resolved through the April 5, 2016 mediation session. Moreover, Ms. Shipp had not alerted either Ms. Lawrence or myself to any further alleged mistreatment by Mr. Matthews after this date. Ms. Shipp's resignation email also made no mention of any specific language or comments that Mr. Matthews had used in the time since. I also knew that Ms. Shipp, like all sales employees, was aware she could contact the company's Employee Relations Department directly at any time, as such was stated in the company's EEO Policy posted at every work facility throughout the

company and available to all employees on the company's, ChannelYou intranet website, but Ms. Shipp did not do so. Thus, reading Ms. Shipp's resignation email in its entirety and in light of all my knowledge at the time, I believed Ms. Shipp was simply rehashing prior complaints that had already been addressed, not alerting us to new ones. It is for this reason that I myself did not forward her resignation email on to the Employee Relations Department for further action.

11.     In all of our communications, Ms. Shipp never once mentioned to me that Mr. Matthews had slammed his hand on a desk or a cubicle wall or had made any-type of inappropriate gender-, age-, or FMLA-related comments in the workplace or otherwise, whether generally or about Ms. Shipp specifically. She also never told me she believed Mr. Matthews was transferring sales accounts and opportunities away from her for any discriminatory or retaliatory reason. Had Ms. Shipp shared any such allegations with me prior to her resignation, I would have referred her concerns to the Employee Relations Department for review and further investigation as that Department deemed appropriate. Indeed, a little over a month after Ms. Shipp resigned, her co-worker, Debbie Broam, sent me a lengthy email describing a host of concerns she had with Mr. Matthews, including several that unambiguously referenced EEO-related concerns. I immediately sent this email to our Employee Relations Department for review and investigation.

12.     The Employee Relations Department subsequently conducted an investigation into Ms. Broam's concerns. Although neither I nor Ms. Lawrence were involved in conducting the investigation, I was privy to its outcome and final report, which reflected interviews with several employees. The investigation also continued and concluded even despite Ms. Broam's decision to resign her employment in the interim. Ultimately, the Employee Relations Department determined that Ms. Broam's EEO and non-EEO allegations could not be substantiated.

13. By virtue of my position and access to personnel records, I am aware that Ms. Shipp never received any corrective action from Mr. Matthews. In fact, the only corrective action on file for Ms. Shipp is one from 2011. Ms. Shipp also became a Major Account Executive back in 2014, and she remained in that same position until she decided to resign her employment on June 7, 2016. Ms. Shipp's essential job duties also did not change any time prior to her resignation.

14. Based upon my review of the company's Peoplesoft records to which I have access, Mr. Matthews was born in September 1960.

15. As a corporate representative of Charter, I serve as a custodian of records.
   a. Attached to Charter's Motion for Summary Judgment are the following documents: (a) Time Warner Cable's Standards of Business Conduct, (b) the Sales Incentive Plan applicable to Ms. Shipp in 2016, (c) Time Warner Cable's Rules of Engagement in place and applicable to Ms. Shipp in 2016, (d) Time Warner Cable's FMLA and EEO Policies in place in 2016, (e) LMS Training Transcripts for both Ms. and Mr. Matthews reflecting online training they took prior to 2016; (f) Ms. Shipp's 2011 Corrective Action, (g) Ms. Shipp's 2015 Performance Evaluation, (h) Shipp's two resignation emails from June 7, 2016, (i) Ms. Shipp's Peoplesoft Job History Report, (j) Ms. Shipp's Attendance Policy Acknowledgement, (k) Ms. Shipp's and Mr. Castano's 2016 Commission Reports; (l) excerpts from the file Ms. Lawrence maintained regarding the concerns Ms. Shipp raised in 2016; and (m) various other emails pertaining to Ms. Shipp from 2015 and 2016. As a custodian of records for Charter, I can attest that each of the documents listed above were created or kept by Time Warner Cable and then Charter in the course of a regularly conducted business activity, and it was the regular practice of Time

Warner Cable or Charter to create or keep such documents. These documents also were created, or the information was transmitted, at or near the time of the act or event that was recorded therein by someone with personal knowledge. These documents also are exact duplicates of their originals.

b. Also attached to Charter's Motion for Summary Judgment are two additional documents: (a) excerpts from the MKM Lodging website (www.MKMLodging.com) and (b) a chart summarizing the information the company was able to gather related to the sales accounts or opportunities that Shipp identified during this litigation as having been wrongly transferred away from her.

c. I personally reviewed the MKM Lodging website today, and I can confirm the excerpts from the MKM Lodging website are true and correct copies of what is reflected on the website.

d. I also personally reviewed the information summarized in the chart, and I can confirm the information contained therein is true and correct and derived from sales contracts, commission reports, and other information contained within the company's records. The underlying documents used to complete this chart also were created or kept by Time Warner Cable and then Charter in the course of a regularly conducted business activity, and it was the regular practice of Time Warner Cable and then Charter to create or keep such document. These documents also were created, or the information reflected therein was transmitted, at or near the time of the act or event reflected, which in turn was recorded by someone with personal knowledge.

I declare under penalty of perjury that the foregoing paragraphs 1 through 15 are true and correct.

Executed on October 1, 2019

_____
TAMARA ZIMMERMAN