# EX. 12

**Page 2**

```
 1              APPEARANCES
 2   FOR PLAINTIFF:
 3        Mr. Robert Notzon
          The Law Office of Robert Notzon
 4        1502 West Avenue
          Austin, Texas 78701
 5        Telephone: 512.474.7563
          Fax:  512.852.4788
 6        E-mail: robert@notzonlaw.com
 7   FOR DEFENDANT:
 8        Ms. Delilah Lorenz Evans
          Attorney at Law
 9        17806 IH 10 West, Suite 400
          San Antonio, Texas 78257
10        Telephone: 210.447.8033
          E-mail: devans@sr-llp.com
11
     FOR MR. CHRIS MATTHEWS:
12
          Mr. Clay T. Grover
13        Rogers Morris & Grover
          Capital One Plaza
14        5718 Westheimer Road, Suite 1200
          Houston, Texas 77057
15        Telephone: 713.960.6033
          Fax:  713.960.6025
16        E-mail: cgrover@rmgllp.com
17   ALSO PRESENT:
18        Ms. Stephanie Shipp
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  INDEX
 2   September 6, 2019              PAGE NO.
 3   Appearances ..................    2
 4   CHRIS MATTHEWS
 5     Examination by Mr. Notzon ..........    4
 6   Changes and Signature ..............   115
 7   Reporter's Certificate ...............   117
 8              EXHIBIT INDEX
 9   NO.       DESCRIPTION            PAGE NO.
10   Exhibit 1    Ms. Broam's chart           62
11   Exhibit 2    8-12-15 email               67
12   Exhibit 3    2-5-16 email                68
13   Exhibit 4    Spreadsheets                79
14   Exhibit 5    Forecast - new/upgrade list    87
15   Exhibit 6    Forecast - new/upgrade list    90
16   Exhibit 7    Renewal/closed won list        93
17   Exhibit 8    3-16-16 email               94
18   Exhibit 9    3-25-16 email               98
19   Exhibit 10   8-4-16 email                100
20   Exhibit 11   Performance improvement       103
21   Exhibit 12   2015 performance review       106
22   Exhibit 13   ABIA contract                107
```

**Page 4**

```
 1                  CHRIS MATTHEWS,
 2   having been first duly sworn, testified as follows:
 3                  EXAMINATION
 4   BY MR. NOTZON:
 5       Q.  Good morning.
 6       A.  Good morning.
 7       Q.  Please state your name for the record.
 8       A.  Chris Matthews.
 9       Q.  Mr. Matthews, have you ever had your
10   deposition taken before?
11       A.  Negative.
12       Q.  Okay.  So just a little ground rules.  You've
13   probably already been prepped a little bit, but just for
14   the record, the court reporter will be taking down every
15   word that's said today.  And because of that, there's
16   some poor souls that have to read this later.  And so to
17   help in that process, if you would wait for me to finish
18   my question before you start your answer and I'll do the
19   same.  I'll wait for you to finish your answer before I
20   start my next question and it will be much easier to
21   understand which answer goes to what question and have
22   them be concise and uninterrupted.
23           The other thing that's important is
24   because she's taking down everything that we say, that
25   we use words and not just uh-huhs or other sounds or
```

**Page 5**

```
 1   gestures, okay?
 2       A.  Yes.
 3       Q.  All right.  And we shouldn't be for a very
 4   long, few hours; but if you need a break, let us know.
 5       A.  Okay.
 6           MS. EVANS:  Mr. Notzon, I'm sorry to
 7   interrupt; but should we put on the appearances of
 8   counsel and the case caption.
 9           MR. NOTZON:  Sure.  And this is Robert
10   Notzon for the plaintiff, Ms. Shipp.
11           MR. GROVER:  Clay Grover representing
12   Chris Matthews in this deposition.
13           MS. EVANS:  Delilah Evans for Charter
14   Communications and we're here on Stephanie Shipp versus
15   Charter Communication, Inc., in the Western District of
16   Texas.
17       Q.  (BY MR. NOTZON) All right.  And you were
18   subpoenaed to be here; is that correct?
19       A.  Yes.
20       Q.  All right.  And you were also asked to bring
21   documents.  Did you bring any documents today?
22       A.  I have no documents and I have no access to
23   documents.
24       Q.  Okay.  So you read the list of requested
25   documents and you've determined you don't have those?
```

                                                                22
1  November of 2008.
2      Q.   Okay.  In what role?
3      A.   A major account executive.
4      Q.   And who was your supervisor?
5      A.   David Burgeson.
6      Q.   And what area of sales was that?
7      A.   Enterprise sales.
8      Q.   And how long were you in that position?
9      A.   Roughly, a year.
10     Q.   And did you make quota?
11     A.   Inconsistently.
12     Q.   Okay.  And where did you go after that?
13     A.   I was promoted to a sales manager within the
14 company.
15     Q.   And who was your supervisor then?
16     A.   I don't recall.
17     Q.   And what types of sales people did you
18 supervise at that time?
19     A.   Account managers.
20     Q.   Okay.
21     A.   Account managers 2.
22     Q.   You're account manager manager?
23     A.   Uh-huh.
24     Q.   Yes?
25     A.   Yes.

                                                                24
1  allowed to transition to another role with Time Warner?
2      A.   Yes.
3      Q.   When you worked in hospitality, was the first
4  time that you were working hospitality, is that when you
5  became the comanager of Texas with Mr. Johanknecht?
6      A.   Yes.
7      Q.   And prior to that, you dealt with enterprise
8  sales; is that correct?
9      A.   Enterprise sales, yes.
10     Q.   Okay.  And would you say that hospitality and
11 enterprise are different animals in the sales world of
12 Time Warner and Charter?
13     A.   Hospitality is a part of the enterprise
14 vertical structure.
15     Q.   Okay.  It has it's unique characteristics?
16     A.   Yes, sir.
17     Q.   And you relied on somewhat on Mr. Johanknecht
18 to help you learn the ropes?
19     A.   The hospitality vertical ropes, yes.
20     Q.   Thank you.  That's what I meant.  And you also
21 relied on some of your salespeople to help teach you the
22 ropes -- isn't that correct -- in hospitality?
23     A.   Under hospitality, yes.
24     Q.   Okay.  Has anyone ever complained about you
25 mistreating them at work?

                                                                23
1      Q.   All right.  Did you ever work for Bruce Bogs?
2      A.   A brief period of time.
3      Q.   And when was that?
4      A.   When I was -- now that I think about it, it
5  was Bruce Bogs that I worked for when -- when I was a, I
6  believe, major account executive.
7      Q.   Okay.  So the other name you gave was
8  incorrect.  It was actually Mr. Bogs or did you work for
9  both those men?
10     A.   Under a realignment at some point I did work
11 for both.  I don't recall the details of it.
12     Q.   Okay.  Was that all still within the same
13 one-year period of time that you were a salesperson?
14     A.   I don't remember.
15     Q.   Okay.  Not more than two years would be
16 accurate?
17     A.   I don't remember.
18     Q.   Okay.  And when you were under Mr. Bogs, did
19 you meet quota?
20     A.   I don't remember.
21     Q.   Okay.  Would it be accurate to say that you
22 may have met quota one time and you didn't meet quota
23 for the remainder of your time under Mr. Bogs?
24     A.   I don't remember.
25     Q.   Even though you didn't make quota, you were

                                                                25
1      A.   I don't remember.
2      Q.   At Time Warner or Charter?
3      A.   I don't remember.
4      Q.   Do you remember if Ms. Shipp complained about
5  your treatment of her?
6      A.   Not to me.
7      Q.   Do you know if she complained to someone else
8  about your treatment of her?
9      A.   I know that Ms. Shipp prior to working for me
10 complained to the ethics committee about me regarding a
11 Facebook reply that I posted on -- in response to
12 another manager's Facebook post.
13     Q.   Is that Mr. Seabold?
14     A.   Yes.
15     Q.   Is that the picture of the young woman
16 covering herself and appearing to be unclothed?
17     A.   Yes.
18     Q.   The comment about Muslims?
19     A.   Yes.
20     Q.   And other than that complaint, do you know of
21 any other complaints that Ms. Shipp made about you?
22     A.   No.
23     Q.   What was the result of that complaint of the
24 naked young lady?
25          MS. EVANS:  Objection; calls for

34

1  of anyone else being held to, you know, a commitment of
2  a year because he wanted me to handle large accounts.
3      Q.  Did you -- is that when you went to Mr. Bogs?
4      A.  I don't recall the timing of it.  It's been so
5  long.
6          MR. NOTZON:  Let's take a short break.
7          (Recess from 10:47 a.m. to 10:56 a.m.)
8      Q.  (BY MR. NOTZON) Back from the break.  So,
9  Mr. Matthews, when you were assigned to be the new
10 manager for, I guess, it would be safe to say the
11 southern half of Texas?
12     A.  Central and south Texas, yes.
13     Q.  Okay.  Do you remember the date of that
14 decision, when you were notified of that decision?
15         MS. EVANS:  Objection.
16     A.  No.
17     Q.  (BY MR. NOTZON) How long was it from the time
18 that you were notified of the decision to the time that
19 you actually took over supervising those -- that sales
20 team?
21     A.  I don't recall.
22     Q.  Okay.  Do you recall sending or communicating
23 with your new sales team that there was a new sheriff in
24 town?
25     A.  No.

35

1      Q.  Okay.  Is that terminology you might use?
2      A.  No.
3      Q.  Okay.  Do you remember when you took over and
4  began supervising the sales team?
5      A.  I want to say it was after the first of the
6  year 2016, to the best of my recollection.
7      Q.  Okay.  It would have been in January?
8      A.  To the best of my recollection.
9      Q.  Okay.  This is marked as Exhibit 1 in a prior
10 deposition.  And it's a record for Ms. Shipp.  And if
11 you look down towards the bottom, it says -- looks like
12 there's a supervisor chain.  And if you look at the far
13 right column, you see your name start showing up and
14 that date is January 22nd?
15         MS. EVANS:  Mr. Notzon, do you have a
16 copy for counsel?
17         MR. NOTZON:  That's previously marked so
18 it's been engaged in other depositions.  So you should
19 have a copy.
20         MS. EVANS:  But you don't have a copy to
21 provide today?
22         MR. NOTZON:  No, no.
23         MS. EVANS:  Then I'm going to take a look
24 before he can answer to any questions about it.  Are you
25 marking this as Exhibit 1 to this deposition?

36

1          MR. NOTZON:  No, I'm not marking this.
2  It's already been marked in the prior depositions.
3          MS. EVANS:  Just so that the record is
4  clear, what deposition is that?
5          MR. NOTZON:  Mr. Johanknecht's.
6      Q.  (BY MR. NOTZON) You see that?
7      A.  Yes.
8      Q.  So does that refresh your recollection that
9  you started supervising Ms. Shipp on January 22nd of
10 2016?
11     A.  I agree that that's what this document says.
12     Q.  Yeah.  Does that -- is that consistent with
13 your memory or does that conflict with your memory?
14     A.  It's generally consistent.
15     Q.  Okay.  And if you look at it, it says on this
16 document and this is -- was provided by Charter to us if
17 you see the Bates-stamped numbers.  It's D-SS Document
18 16.  You see how Ms. Shipp is stated to have gone off on
19 family medical leave on January 19th?
20     A.  Uh-huh.
21     Q.  Yes?
22     A.  Yes.
23     Q.  So three days before you took over as her
24 supervisor and then she came back January 30th; is that
25 correct?

37

1      A.  Well, it would appear that it would be on
2  February 1st return from leave.
3      Q.  Thank you.  Okay.  So do you recall when you
4  took over as Ms. Shipp's supervisor that she was off on
5  FMLA leave?
6      A.  I do not.
7      Q.  Okay.  Do you recall having a meeting with
8  Ms. Shipp prior to you becoming her supervisor?
9      A.  I do not.
10     Q.  What's the first time you remember interacting
11 with Ms. Shipp?
12     A.  Several years before she worked for me.
13     Q.  Okay.  And what was the nature of that
14 interaction?
15     A.  I handled, as I had previously stated, I
16 managed the Account Manager 2s throughout the state of
17 Texas.  We supported all of the verticals to include
18 hospitality.  And my team supported the hospitality
19 vertical, the existing base.  And so there was
20 interaction between my team and Stephanie and the rest
21 of the major account executives.
22     Q.  Okay.  So that's a general way that you would
23 interact with her because your team members would be
24 supporting her contracts?
25     A.  Correct.

**Page 38**

1  Q. Okay. And did you have any direct interaction
2  with Ms. Shipp?
3  A. Not that I recall.
4  Q. Okay. And what is the first time you remember
5  interacting with Ms. Shipp as her supervisor?
6  A. I don't remember specifically.
7  Q. Okay. What's the first one you do remember,
8  the first interaction with Ms. Shipp that you do
9  remember as her supervisor?
10  A. I don't recall.
11  Q. Did you ever counsel Ms. Shipp about her
12  performance?
13  A. No.
14  Q. Did you ever raise your voice to Ms. Shipp?
15  A. No.
16  Q. Did you ever slam your hand on the desk in her
17  presence?
18  A. No.
19  Q. Did you ever get frustrated with Ms. Shipp?
20  A. No.
21  Q. Did you ever tell Ms. Shipp she's not doing a
22  good job?
23  A. Not that I recall.
24  Q. I'm going to ask you the same series of
25  questions for Ms. Broam. Did you hire Ms. Broam?

**Page 39**

1  A. I did not.
2  Q. You inherited her?
3  A. Yes, I did.
4  Q. Along with the rest of the team.
5      MS. EVANS: Objection.
6  Q. (BY MR. NOTZON) Is that correct?
7  A. No. Some of the team members were on my
8  existing team.
9  Q. You brought some team members with you and
10  then you inherited some from Mr. Johanknecht?
11  A. Yes.
12  Q. Okay. So who were the ones that you
13  inherited?
14  A. Stephanie Shipp, Debbie Sunny Broam, Tom
15  Phillips in northern California. Daren Weeks in Montana
16  and I believe the rest of my team was in place.
17  Q. What about Mr. Ovalle?
18  A. Mr. Ovalle -- yes, Michael Ovalle.
19  Q. Was an inheritance?
20  A. Yes.
21  Q. What about Ms. Savage?
22  A. Yes, that was inherited.
23  Q. Okay. What was Ms. Carasella?
24  A. I don't recall specifically.
25  Q. Okay. Was Mr. Hector Castano one of your team

**Page 40**

1  members that you brought with you?
2  A. Yes.
3  Q. How many account managers did you bring with
4  you? Let's make it easier. How many did you bring with
5  you that were in Austin?
6  A. To the best of my recollection, one.
7  Q. Just Mr. Castano?
8  A. I do believe that to be correct.
9  Q. Okay. Did Mr. Bransick, was he on your team?
10  A. Let me revise that. I don't know
11  specifically.
12  Q. Okay. Scott Laymen?
13  A. That's what was in my mind.
14  Q. No problem.
15  A. But, again, the timing when everything that
16  was going on that, it's hard to keep track of very
17  specific timeframes.
18  Q. Right. So Laymen, Bransick, and Castano were
19  account managers?
20  A. No. Bransick never worked for me.
21  Q. Okay. He just was there, but he was working
22  on a different team?
23  A. Yes.
24  Q. When I say there, he was physically present in
25  the office in a cubical near your team members?

**Page 41**

1  A. Yes.
2  Q. But Mr. Laymen did work for you?
3  A. Yes.
4  Q. Okay. Do you recall Ms. Shipp being on FMLA
5  leave at or around the time you began supervising her?
6      MR. GROVER: Objection; asked and
7  answered.
8  A. Again, I don't recall.
9  Q. (BY MR. NOTZON) Okay. Do you recall if
10  Ms. Shipp was having trouble getting sales worked up
11  during the time that she was returned from FMLA leave?
12  A. I recall that Stephanie had challenges
13  administering to Salesforce. For or after, I can't say.
14  I don't know.
15  Q. What do you recall were her issues with
16  Salesforce?
17  A. The ability to put orders into Salesforce.
18  Salesforce is an order to cash system, in addition to
19  CRM, customer relationship management, tool. It is a
20  very complex system, very intricate and extremely
21  detailed oriented. My observation was that Stephanie
22  had challenges in getting orders into the system, the
23  right product selections, contracts being done
24  accurately.
25  Q. You say being done, being entered into the

42

1  system?
2      A.  Correct.
3      Q.  Okay.  I didn't want to stop you.  I just
4  wanted to clarify.
5      A.  No, that's my observation.
6      Q.  Okay.  Was there also an issue that you were
7  having with her related to, not Salesforce, but your own
8  spreadsheet?
9      A.  The issue that I observed was that Stephanie
10 had a very difficult time administering to a
11 spreadsheet, which is just nothing more than data entry
12 into a defined spreadsheet, updating that information on
13 a daily basis or every other day basis, enabling me to
14 track our business, our progress or KPIs measuring our
15 KPIs, and being able to input that information and save
16 it.  It was posted on a company drive and that was a big
17 challenge.  So, yes, I observed that.
18     Q.  What is a KPI?
19     A.  Key performance index.
20     Q.  Okay.  And you said it's fairly
21 straightforward data entry and save?
22     A.  Uh-huh.
23     Q.  Yes?
24     A.  Yes.
25     Q.  What did you understand her problem with that

43

1  was?
2      A.  Being able to enter the information and which
3  tab.  There were four tabs to enter information on,
4  having a very difficult time in putting the information.
5  I'm not clear why.  And getting it accurate and then I
6  think the bigger challenge appeared to be overwriting or
7  saving the information back to the hard drive, which was
8  just nothing more than clicking the save button.
9      Q.  And did you go over her abilities with that
10 spreadsheet and what she was doing?
11     A.  I did.  In my office.
12     Q.  And did you show her how to do it or did you
13 watch her do it and then teach her how to do it?  How
14 did you go about that process?
15     A.  Both.  It wasn't any single event.  We spent
16 time in my office; walked her through what the
17 spreadsheet was; the reason for it, certainly; where the
18 information resides; and really the simplicity of how it
19 operates because I didn't want to, you know, I wasn't
20 putting something in there to create another job for
21 someone.  We had already -- we were administering to
22 Salesforce.com.  This was something outside of
23 Salesforce.com to be able to crosscheck and reference
24 because Salesforce.com was being implemented over a
25 period of several years, but it was still not 100

44

1  percent.  So we kept the spreadsheet separately.
2      Q.  Wouldn't it be accurate to say that Salesforce
3  had everything in it that your spreadsheet had, as well?
4          MS. EVANS:  Objection; calls for
5  speculation.
6      A.  It was my experience -- my observation and my
7  experience that while Salesforce, the implementation of
8  Salesforce, the evolution of Salesforce continuing to
9  evolve over a period of years, that from time to time
10 there were kinks in the system and this was -- this was
11 a separate means to just track down, not down to the
12 product level but just track the revenue customer order
13 numbers.
14     Q.  (BY MR. NOTZON) And how many times did you
15 have Ms. Shipp in your office talking about your
16 spreadsheet and her what you call her problems in
17 inputting data and saving it?
18     A.  One time very specifically I do recall.  And
19 then, again, in her cubical to not only go over the
20 spreadsheet but to help her administer to all of the
21 files that she had on her desktop.  It did appear as
22 though Stephanie had a challenge in finding things in
23 her computer because they were all over her desktop.  So
24 I tried to help her organize that a little better so
25 that she would be more efficient in performing her

45

1  duties.
2      Q.  Other than the one specific time in your
3  office that you testified about and the one time in her
4  cubical, how many other times?
5      A.  I don't recall.
6      Q.  Okay.  Did you assign her to do any training?
7      A.  Yes.
8      Q.  And what training did she do?
9      A.  I had Scott Laymen, I believe, spent a week
10 with Stephanie Shipp on Salesforce.com.  I had Hector
11 Castano spend the better part of a week I believe it was
12 half days and again going through the intricacies,
13 processing the orders in Salesforce.com.
14     Q.  Did Mr. Laymen or Mr. Castano ever report to
15 you how that training went?
16     A.  In general.  I mean, it wasn't -- it wasn't
17 anything that, you know, there were very specific
18 criteria that they measured that on, but felt they had
19 done everything they could do to assist her.
20     Q.  Did Ms. Shipp ever provide you feedback of her
21 perception of that training?
22     A.  I don't recall specifically.
23     Q.  Do you recall her complaining to you that they
24 didn't -- Mr. Castano actually didn't train her.  He
25 just did it himself and said he didn't have enough time

46

1  and then sent her away?
2      A.  I do vaguely remember -- I do vaguely remember
3  that.
4      Q.  Did you do anything to address that issue?
5      A.  I spoke with Hector and Hector at that point,
6  to the best of my recollection, intimated that he had
7  done the best that he could do.  That there appeared to
8  be distractions during that process.  Some on his part.
9  Some on Stephanie's part.
10     Q.  Do you recall ever taking Ms. Shipp's
11 contracts while she was gone out of the office and
12 giving them to Mr. Castano to work?
13     A.  Accounts, yeah.  When Stephanie was later on
14 on FMLA at some point, yeah, I reallocated accounts.
15     Q.  Okay.  And when she returned, did you give
16 them back to her?
17     A.  Possibly some, not all.
18     Q.  And do you recall any of those?
19     A.  I do not.
20     Q.  And do you recall Ms. Shipp complaining that
21 accounts had been taken away from her while she was off
22 on leave?
23     A.  I do.
24     Q.  And what do you recall doing about that?
25     A.  So in following the manager's guidance, the

47

1  manager playbook, the Charter manager playbook, it is
2  within the manager's delegation of authority to move
3  accounts around as is in the best interest of the
4  company, the customer because at no point does any one
5  employee own the accounts.  The company owns the
6  accounts.  I administered and moved accounts around
7  based upon customer need, customer dissatisfaction.  And
8  so if customers were not happy, I was not going to move
9  those accounts back.
10     Q.  It could also be by manager preference?
11     A.  As long as the accounts are being managed to
12 the customer satisfaction.  I'm not sure I understand
13 your question.
14     Q.  Well, you could -- you could assign an account
15 from one salesperson to another just because you have
16 the preference, you had that authority?
17     A.  You could.
18     Q.  You didn't actually have to justify your
19 transfer of that account, correct?
20     A.  So, no, you don't.  However, you're disrupting
21 the customer experience in doing so.  And if you don't
22 have a -- if you don't have a very specific reason to do
23 that, short of realignment of the territories, that is a
24 company initiative, there would be no point in doing
25 that.

48

1      Q.  Did you ever provide Ms. Shipp with any new
2  account leads from the time you took over as her
3  supervisor on January 22nd to the time she quit in June
4  of 2016?
5      A.  I don't recall specifically, no.
6      Q.  Do you recall providing Mr. Castano with
7  leads?
8      A.  I don't recall specifically.
9      Q.  Do you recall that Ms. Broam went off on FMLA
10 leave shortly after you became supervisor?
11     A.  I remember that she went on FMLA.  Timing of
12 it, I don't recall.
13     Q.  Do you recall taking accounts away from her
14 and giving them to Mr. Castano to work?
15     A.  I remember as needed moving accounts around,
16 not specifically to Hector Castano but to everybody on
17 the team within that area.  That, being central Texas.
18     Q.  But you can't recall who got what accounts?
19     A.  No.
20     Q.  Do you recall if you gave any to Ms. Shipp?
21     A.  I don't recall.
22     Q.  Do you recall that Mr. Castano was given a
23 promotion from account manager to major account
24 executive?
25     A.  I recall that Hector Castano applied for an

49

1  open major account executive position, interviewed, and
2  did get that position.
3      Q.  Were you the hiring decision maker?
4      A.  Yes.
5      Q.  And who else applied?
6      A.  I don't recall.
7      Q.  Who else interviewed?
8      A.  I don't recall.
9      Q.  How many people applied?
10         MS. EVANS:  Objection; calls for
11 speculation.
12     A.  I don't recall.
13     Q.  (BY MR. NOTZON) How many people interviewed?
14         MS. EVANS:  Objection; calls for
15 speculation.
16     A.  I don't recall.
17     Q.  (BY MR. NOTZON) Was there anyone else that
18 interviewed the applicants besides you?
19         MS. EVANS:  Calls for speculation;
20 objection.
21     A.  I believe that -- I can't say specifically.
22     Q.  (BY MR. NOTZON) Was there anybody in the room
23 interviewing the applicants with you?
24     A.  I don't believe so.
25     Q.  And how did that MAE position become open?

**Page 54**

1  A.  No.
2  Q.  But from your testimony, there should be an
3  application for Mr. Castano, an interview process and
4  your having made a decision to promote Mr. Castano to
5  MAE?
6      MS. EVANS:  Objection; calls for
7  speculation.
8  A.  That sounds like a Charter process.
9  Q.  (BY MR. NOTZON) Okay.  So once Mr. Castano
10 became an MAE on your team, did you fill the account
11 manager vacancy that he left?
12 A.  I don't recall.
13 Q.  Did Mr. Castano have a ramp-up quota or was he
14 given a full-on quota when he became an MAE?
15 A.  I don't recall the specifics, but it's
16 detailed in the company policy.
17 Q.  Okay.  That wasn't your decision to make?
18 A.  No.
19 Q.  Okay.  So I was going to ask a series of
20 questions about Ms. Broam that I asked about Ms. Shipp.
21 Did you ever raise your voice to Ms. Broam?
22 A.  No.
23 Q.  Did you ever slam your hand on the desk?
24 A.  No.
25 Q.  To Ms. Broam?

**Page 55**

1  A.  No.
2  Q.  Did you ever get frustrated with Ms. Broam?
3  A.  No.
4  Q.  Did Ms. Broam have problems with your
5  spreadsheet, as well?
6  A.  Yes.
7  Q.  Were they similar in nature to Ms. Shipp's
8  problems?
9  A.  Similar.
10 Q.  Did you address them in the same way that you
11 did with Ms. Shipp?
12 A.  Yes.
13 Q.  And did they resolve?
14 A.  No.
15 Q.  Did Ms. Broam also have problems with
16 Salesforce as you've described Ms. Shipp having?
17 A.  Yes.
18 Q.  Did you address those in the same way?
19 A.  Yes.
20 Q.  Did Ms. Shipp's or Ms. Broam's problems with
21 Salesforce ever resolve?
22 A.  No.
23 Q.  Did you try to take any other steps to assist
24 them in being able to successfully operate your
25 spreadsheet or Salesforce?

**Page 56**

1      MR. GROVER:  Other than what he's
2  testified to?
3  Q.  (BY MR. NOTZON) After you determined that
4  their problems did not resolve.
5  A.  I don't recall.
6  Q.  Do you know what Nitro is?
7  A.  Uh-huh, yes.
8  Q.  What is Nitro?
9  A.  Nitro is a PDF program.  It's one that if you
10 have scanned documents, you can put them into Nitro.
11 They become a PDF and they can be attached as a matter
12 of record into Salesforce and/or anything else.
13 Q.  Was it something new that was occurring on
14 your team?
15 A.  At one point, yes.
16 Q.  When Ms. Shipp was there?
17 A.  I don't recall.
18 Q.  Was there some training associated with that?
19 A.  One of my team members did, who was very
20 proficient in it, did conduct training.
21 Q.  Who was that?
22 A.  I don't recall specifically.
23 Q.  Okay.  Was it Hector Castano?
24 A.  Possibly.
25 Q.  Was it Cory?

**Page 57**

1  A.  Dickey.
2  Q.  Dickey, yeah.
3  A.  I don't recall.
4  Q.  Okay.  Did Ms. Shipp have issues with Nitro?
5  A.  I don't recall specifically.
6  Q.  Okay.  Do you recall Ms. Shipp ever
7  complaining that Mr. Castano or Mr. Dickey did not
8  provide her with assistance with Nitro?
9  A.  I don't recall.
10 Q.  Do you recall the training that was happening
11 in April 20th and 21st of 2016 in Austin that involved
12 both your team and Mr. Johanknecht team?  It was kind of
13 two-day thing.
14 A.  Uh-huh, I do.
15 Q.  Yeah.  And do you recall the event where
16 Mr. Castano became inebriated and was determined that he
17 shouldn't drive?
18 A.  I do.
19 Q.  Do you recall what happened at that time?
20      MS. EVANS:  Objection; vague.
21 Q.  (BY MR. NOTZON) How did you learn about that?
22 A.  I observed Hector Castano's condition.
23 Q.  Okay.  And so nobody reported it to you.  You
24 saw it yourself?
25 A.  Correct.

58

1  Q.  And did somebody get his keys?
2  A.  Yes.
3  Q.  And who -- was that Ms. Shipp?
4  A.  I don't recall. I don't recall who it was.
5  Q.  Okay. And did someone call his wife,
6  Ms. Castano?
7  A.  Yes.
8  Q.  And who was that?
9  A.  I believe Hector did.
10 Q.  Hector called his own wife?
11 A.  I believe he did.
12 Q.  Okay. And did you guys go drinking out after
13 that?
14 A.  I did not.
15 Q.  Okay. Did you ever go -- was it common
16 practice for you to go to happy hours with your team or
17 members of your team?
18 A.  No.
19 Q.  That wasn't a weekly event?
20 A.  No.
21 Q.  Okay. Did you ever go to happy hour?
22 A.  Yes.
23 Q.  And when you went to happy hours, who would
24 you go with?
25 A.  Other managers, team members both inside and

59

1  outside of my team.
2  Q.  And when would you go?
3  A.  Typically on a -- typically, but not
4  exclusively, Friday at the end of the week.
5  Q.  So just an end-of-the-week thing?
6  A.  Pretty much.
7  Q.  Not a celebration of a sales event or?
8  A.  No.
9  Q.  Okay. And -- but you're saying it wasn't a
10 weekly thing?
11 A.  No.
12 Q.  Okay. Once a month, twice a month? What
13 would you say?
14 A.  Sometimes once a month. Sometimes not at all.
15 Q.  Okay. And would you pick up the tab?
16 A.  If it was a team building event that was
17 approved, we had food and beverages, I might; but it was
18 approved.
19 Q.  Okay. Otherwise, people would chip in?
20 A.  People were responsible for their own tabs.
21 Q.  Okay. Did you ever go to any strip clubs with
22 your coworkers?
23 A.  Negative ever.
24 Q.  There's a 2015 performance review from
25 Ms. Shipp. It was Exhibit 3 to Mr. Johanknecht's

60

1  deposition. And it has your name as signing it on the
2  last page with a date of February 25th. I'm just asking
3  if, in fact, is it true that you didn't actually fill in
4  any of the evaluations, that that was Mr. Johanknecht.
5  You were just responsible for signing it because you
6  became her manager before it had been executed?
7  A.  I'd like to review the document.
8      MS. EVANS:  Do you have a copy for,
9  Counsel?
10     MR. NOTZON:  I don't because it's already
11 been marked as an exhibit and you have a copy already.
12     MS. EVANS:  Are you talking about Mr.
13 Johanknecht's deposition?
14     MR. NOTZON:  Yes.
15     MS. EVANS:  I wasn't present at that
16 deposition.
17     MR. NOTZON:  Yes. Your firm was.
18 Q.  (BY MR. NOTZON) So Mr. Matthews --
19     MR. GROVER:  Hold on.
20 Q.  (BY MR. NOTZON) Yeah, I know; but I'm asking
21 you to take a short break. This is the 2015. You
22 didn't start supervising her until January of 2016.
23 A.  Uh-huh.
24 Q.  So I'm just wanting to verify that you didn't
25 have a role to play in evaluating her for this

61

1  evaluation?
2  A.  And I'll respond to you once I've had time to
3  review the document. I understand the question.
4      MR. GROVER:  And before you respond,
5  let's let Ms. Evans look at it.
6      MS. EVANS:  Thank you.
7      MR. GROVER:  You bet.
8      MS. EVANS:  Mr. Notzon, do you have a
9  copy that's not highlighted to ask the witness about?
10 It wasn't produced to you with highlighting on it.
11     MR. NOTZON:  No.
12     MS. EVANS:  For the record, this is
13 marked Steve Johanknecht Exhibit No. 3D-SS 56 through
14 63.
15     MR. NOTZON:  It's the document that was
16 marked as Exhibit 3 to Mr. Johanknecht's deposition
17 which has already been stated on the record. So it's a
18 unique document and I'm just waiting for the answer.
19     MR. GROVER:  Did it have highlighting on
20 it --
21     MR. NOTZON:  It doesn't matter.
22     MR. GROVER:  When it was used as an
23 exhibit? I'm just trying to clarify.
24     MR. NOTZON:  No. Highlighting is not
25 irrelevant because it's not being marked in this

### Page 66

1  Q. You don't recall filling it or you don't
2  recall who you filled it with or both?
3  A. I don't recall filling it.
4  Q. Okay. Would it be true that if that
5  Ms. Broam's position as an MAE that was vacated when she
6  became an account manager and Ms. Shipp's position that
7  was vacated when she quit, that those positions, if they
8  were filled, they would have been filled by you as the
9  supervisor?
10        MS. EVANS: Objection; assumes facts not
11  in evidence, calls for speculation.
12  A. Please restate that.
13  Q. (BY MR. NOTZON) Sure. Who -- wouldn't it be
14  you that would be responsible for filling empty
15  employment positions under your supervision?
16  A. I would be responsible for interviewing,
17  evaluating, and making a selection. That also assumes
18  that the head count was not pulled from me, which I
19  don't recall whether it was or not because head count
20  can be reallocated across teams. So -- and I know that
21  at one point there were positions that shifted -- head
22  count positions that shifted between Steve's team and my
23  team. That is not anything that I'm in control of.
24  Q. Okay. And do you recall that happening in
25  2016?

### Page 67

1  A. I don't recall.
2  Q. Okay. So you're just talking in the
3  hypothetical when you responded before?
4  A. Yes.
5  Q. And then when Ms. Broam quit in August of
6  2016, did you fill that position?
7  A. I don't recall.
8  Q. Here's Exhibit 2 to your deposition.
9         (Exhibit 2 marked)
10  A. Okay.
11  Q. (BY MR. NOTZON) All right. Do you recall this
12  situation?
13  A. No, not this specific one. There were
14  multiple; but, no, I don't remember this very specific
15  one.
16  Q. Okay. You're involved with -- this is before
17  you become Ms. Shipp's supervisor, correct?
18  A. Yes.
19  Q. Okay. And you're Mr. Dickey's supervisor at
20  that time?
21  A. Correct.
22  Q. Okay. And it's maybe a dispute, like dispute
23  between Mr. Dickey and Ms. Shipp, as to what a split
24  would be on the commission and you as the supervisor of
25  Mr. Dickey and Mr. Johanknecht as a supervisor of

### Page 68

1  Ms. Shipp are trying to figure it out?
2  A. Correct.
3  Q. It's eventually -- the initial was an effort
4  from Mr. Dickey to make an 85/15 his way split?
5  A. That appears to be the case.
6  Q. And it was resolved to be a 50/50 between the
7  two, correct?
8  A. That does appear to be.
9  Q. And all four individuals agreed to that?
10  A. That appears to be.
11  Q. Okay. And do you know what happened with that
12  split or that work later? Do you recall?
13  A. I don't recall.
14  Q. Here's Exhibit 3 to your deposition.
15         (Exhibit 3 marked)
16  A. Okay.
17  Q. (BY MR. NOTZON) Do you recall this?
18  A. I don't.
19  Q. Okay.
20  A. But, I mean, it's clearly from me --
21  Q. Yeah.
22  A. -- is my participation in any of these.
23  Q. Okay. And you're referring to Exhibit 3 and
24  Exhibit 2 having your name on the emails?
25  A. That is correct.

### Page 69

1  Q. Okay. And if you look at the -- so Exhibit 3
2  indicates that the 50/50 split is being revoked and 100
3  percent is being given to Mr. Dickey; is that correct?
4  A. That is correct.
5  Q. And that is as a result of the opportunity CW,
6  which I understand means closed when.
7  A. Closed won, correct.
8  Q. Meaning that the deal's done and the
9  salesperson can get paid their commission?
10  A. Whoever was responsible for the opportunity as
11  a matter of record in Salesforce, correct?
12  Q. Okay. And this particular opportunity closed
13  on -- closed won on January 26th; is that correct?
14  A. That appears to be correct.
15  Q. Okay. And that is the same time period that
16  Ms. Shipp is on FMLA; is that correct?
17  A. I don't recall specifically whatever you had
18  on that list.
19  Q. Yeah. It was 1/19 to February 1st I think is
20  what you said.
21  A. Okay.
22  Q. Do you remember that?
23         MS. EVANS: Objection. We'll let the
24  document speak for itself.
25  Q. (BY MR. NOTZON) Okay. Do you want to look at

Page 70

1  it?
2  A.  No.
3  Q.  Okay.  And so it doesn't revert back to 85/15.
4  It goes back to a hundred percent -- it goes to a
5  hundred percent for Mr. Dickey?
6  A.  Uh-huh.
7  Q.  And that was your decision, correct?
8       MS. EVANS:  Objection; misstates the
9  evidence.
10 A.  No.
11      MR. GROVER:  You can go ahead.
12 A.  As it clearly states, that Steve and I made
13 that joint decision, the very last sentence.
14 Q.  (BY MR. NOTZON) That it would go to a hundred
15 percent to Mr. Dickey?
16 A.  Correct.  Clearly, that was, as stated in the
17 third to last sentence, "The secondary rep failed to
18 perform her agreed upon duties in the pursuit of this
19 opportunity."  That would have been as was consistent
20 whenever Steve and I worked on disputes between our
21 teams or involving our teams, we would review the
22 detailed information in Salesforce.  We would talk to
23 the respective representatives, and we would make a
24 decision based upon our findings.
25 Q.  Does you talk to Mr. Dickey about it?

Page 71

1  A.  I am sure I did.
2  Q.  Did you talk to Ms. Shipp about it?
3  A.  I don't recall.
4  Q.  It would be fair to talk to both of them?
5  A.  Yes.
6  Q.  Do you know who Kristine Lawrence is?
7  A.  Yes.  She's the director of HR and was my HR
8  representative.
9  Q.  What do you mean by your HR representative?
10 A.  For my team.
11 Q.  So there's several.  So Mr. Johanknecht's team
12 might have a different HR rep.
13 A.  I don't know.
14 Q.  Okay.  That's who you were assigned to
15 interact with if you had issues with your team?
16 A.  Correct.
17 Q.  And do you recall ever interacting with her
18 about any complaints in your team?
19 A.  I interacted with Kristine on a regular basis.
20 Q.  Okay.  Did she ever conduct any investigations
21 into complaints on your team -- from your team?
22 A.  Yes.
23 Q.  And what do you recall about that?
24 A.  I don't.  I don't recall.  I know that over
25 the course of nine years, whether disciplinary actions,

Page 72

1  I always consulted with Kristine and it obviously a
2  requirement from the company, but I always consulted
3  with Kristine once she was assigned to our team.
4  Q.  And focusing on 2016 year, if possible, not
5  the nine years that you were a supervisor, do you recall
6  interacting with Ms. Lawrence then?
7  A.  Not specifically.  I'm sure that I did but not
8  specifically.
9  Q.  Okay.  Did you ever interact with any other HR
10 representative during that 2016 year?
11 A.  I don't recall.
12 Q.  Other than computer skills, what other issues
13 did you have with Ms. Shipp in her performance of her
14 duty?
15 A.  There was a pattern that I observed and
16 documented of Ms. Shipp putting erroneous information
17 into Salesforce in multiple facets.
18 Q.  I was -- when I said computer skills, I was
19 kind of lumping the your spreadsheet and the Salesforce
20 issues that we had already discussed in kind of that
21 bucket of we've already discussed that.  I was asking if
22 there was anything else.
23 A.  So I'm not clear on your question because I
24 viewed my responses to your computer Salesforce
25 administration as the understanding and the ability or

Page 73

1  efficiency of which you administer to that.  Applying
2  the -- following the input, the guidance that the
3  company provided as to how and what information is
4  supposed to be put into those systems, in my view, was a
5  separate issue.
6  Q.  I apologize.  Then carry on.
7  A.  So Stephanie had a propensity to when she put
8  deals into the system, she would continue to push those
9  deals out.  And while we are enterprise, we are long
10 sales cycle.  Just week, after week, after week, after
11 week.  And there's notes when you put those you
12 administer to that because that is part of our KPI, key
13 performance indexes.  And it speaks to close ratio,
14 close intervals, opportunity generation, opportunity to
15 close.  These are things that we measure success of the
16 individual salespeople.  That opportunities, by and
17 large, were moved consistently with the same notes or no
18 notes in the system because when you change dates, you
19 have to put in there what it is, why you're changing
20 that.  These would go on for a very protracted period of
21 time.
22      In some cases documented, again, Kristine
23 Lawrence has the information, that when one of the
24 fundamental end data points that you put into the
25 Salesforce system are the customer contacts with their

74

1  emails and their phone numbers.  There were periods of
2  time, not with Stephanie specifically, but just in
3  general over the course of nine years, that if a rep was
4  having a tough time, I would reach out to the customer
5  to see if there is something that I could do to help
6  move the opportunity along.
7       What I discovered in printing out the
8  customer lists, Stephanie, specifically, that there was
9  a commonality that Stephanie had, in fact, put her cell
10 phone number as the customer's point of contact.  Again,
11 that's all documented.  That's a problem.  If anybody in
12 our system, whether it's presale or post-sale needed to
13 get ahold of that customer, customer support, they would
14 reference Salesforce as one of two systems -- would be
15 the billing platform, which is a separate system or
16 Salesforce.com -- but they would reference those systems
17 to be able to get ahold of that customer.
18      If we reallocate accounts from one rep to
19 another, again, that point of contact information is
20 relevant and germane to our business in being able to
21 get ahold of our customers.  Consistently, we found -- I
22 found that Stephanie's cell phone number was listed as
23 the customer point of contact.
24    Q.  Did you talk to her about that?
25    A.  That may have been -- that was right, if I

75

1  remember correctly, that was right around the time that
2  I believe Stephanie was leaving.
3     Q.  How did you find out about that, that she was
4  using her phone number?
5     A.  Just listing out the customer accounts because
6  we were going through territory management and I had to
7  reallocate accounts and redistribute accounts, not
8  Stephanie or Debbie Broam specifically, but across my
9  whole team.  And that was a company initiative, not my
10 initiative.
11    Q.  Was that in April of 2016?
12    A.  I don't remember.
13    Q.  So if it was a couple of months before
14 Ms. Shipp left, that would have given you an opportunity
15 to address that with Ms. Shipp?
16    A.  Hypothetical.
17    Q.  And you would have documented that
18 communication?
19    A.  Yes.
20    Q.  And you would have followed up to make sure
21 she fixed that and changed those numbers to the actual
22 contact for the customer?
23    A.  I would have followed whatever guidance was
24 provided by HR.  And it's something that I would have
25 and did communicate to HR.

76

1     Q.  Okay.  And you don't recall what happened from
2  communication with HR?
3     A.  No, not specifically.
4     Q.  Do you recall disciplining Ms. Shipp?
5     A.  No.
6     Q.  Do you recall following up to make sure that
7  she changed those numbers back to the actual phone
8  numbers of the customer?
9     A.  Again, to the best of my recollection, that
10 was towards her departure.
11    Q.  Those would still need to be changed, wouldn't
12 they?
13    A.  I changed the accounts.
14    Q.  You changed the numbers yourself?
15    A.  Not the phone numbers, the account assignments
16 because there were a lot of them not being addressed or
17 they were just dead deals.
18    Q.  Okay.  And you changed the assignment of those
19 accounts to other salespeople?
20    A.  Account managers and/or MAEs to go through and
21 find out is there any meat on the bone here, is this a
22 reel deal.
23    Q.  Okay.  And it was their responsibility then to
24 change the contact telephone numbers?
25    A.  If they could find the -- because they would

77

1  go through and update that information based upon being
2  able to get ahold of the customer or not.  If the
3  opportunity was not a valid opportunity or no longer a
4  valid opportunity, then they would delete that
5  opportunity or archive that opportunity.
6     Q.  And do you know if that happened?
7     A.  Yes, it did.
8     Q.  And what accounts?
9     A.  I don't remember the specifics.
10    Q.  How many?
11    A.  I don't remember.
12    Q.  Who reported to you that those accounts listed
13 under Ms. Shipp's book were not real deals?
14    A.  Whoever I distributed them to within central
15 and south Texas on my team.
16    Q.  Do you remember anybody reporting that to you?
17    A.  Reporting what?
18    Q.  That deals under Ms. Shipp's book were dead
19 deals?
20    A.  Yes.
21    Q.  Were not real?
22    A.  Yes.
23    Q.  And who?
24    A.  Anybody on my team.  I mean, it was not just
25 one person, so.

## Page 78

1  Q. How many times did that get reported to you,
2  that she had dead deals on her book?
3  A. I don't recall specifically.
4  Q. Why would she carry dead deals?
5  A. Because it made the KPIs look good. In other
6  words, that was an active opportunity. Our KPIs were as
7  specified by the company. The KPIs were there to
8  measure new opportunity creation, activity, salesperson
9  activity and that is something that would -- dashboards
10 were built within Salesforce system at the rep level,
11 the manager, the director, and the VP level and beyond.
12 And everybody monitored those KPIs. So if you kept your
13 opportunities, whether they were real or not, you kept a
14 high volume of opportunities, it looked like you were
15 doing your job.
16  Q. Wouldn't it tank your KPIs on closing, though?
17  A. Sure. It could. It could impact that.
18  Q. Did you ever refer to Ms. Shipp as "playing
19 the victim"?
20  A. I don't recall.
21  Q. Having a victim mentality?
22  A. Not that I recall.
23  Q. Sitting here today, do you think Ms. Shipp
24 plays a victim mentality from your memory of her
25 interacting with her?

## Page 79

1  A. I have no opinion.
2  Q. Here's Exhibit 4 to your deposition. Again,
3  these are spreadsheets that were provided to us --
4  actually this was provided yesterday from Charter.
5      (Exhibit 4 marked)
6  A. Okay.
7  Q. (BY MR. NOTZON) Does this look familiar to
8  you?
9  A. It does.
10  Q. Is this one of your spreadsheet charts?
11  A. It is.
12  Q. Okay. And if you can describe for us what
13 does page 1 of Exhibit 4 show us.
14  A. This is renewal closed won revenue and it
15 shows the representative, the opportunity, name --
16 company name, opportunity name, the Salesforce.com
17 record, the month recurring revenue associated with
18 that, the total gross written revenue, was it split with
19 any other representative; and then if it were split, was
20 the -- was the representative within team Matthews or
21 was it cross teams.
22  Q. Okay. And then that's what page 2 just would
23 carry on off the right margin?
24  A. Yeah, this should have all been on one page,
25 but yes.

## Page 80

1  Q. Okay.
2  A. Because there's still additional information
3  on the back. That would further go on to -- if you
4  carry this over to the back page --
5  Q. Yes.
6  A. -- this is all one linear sheet.
7  Q. Okay.
8  A. And that would also indicate the
9  representative MRC, monthly recurring revenue charge;
10 then the NRC, the non-recurring one-time charges; and
11 then the split adjustments. That references -- that
12 references the column was it split, yes or no.
13  Q. Yes.
14  A. And then the percentage of split.
15  Q. So when it says adjusted, that means this is
16 the amount that goes to the salesperson on that line?
17  A. Yes.
18  Q. Okay. And if we look at -- and the third
19 page, what is the third page show us? Is that part of
20 the same chart or is that a different chart? Oh, that's
21 just the totals.
22  A. Correct. That's the bottom of the page.
23  Q. Okay. Got you.
24  A. That, again, isn't fully printed out.
25  Q. So it goes off the bottom margin of the first

## Page 81

1  page?
2  A. Correct.
3  Q. Okay. Thanks. So back to the first page,
4  Mr. Castano has a Best Western Bastrop. And if you look
5  down, there's an Econo Lodge and Holiday Inn. Do you
6  know how those accounts were assigned to Mr. Castano?
7  A. No.
8  Q. And these Salesforce numbers, opportunity
9  numbers -- so if you were still there and you wanted to
10 look at that Best Western Bastrop account and you
11 punched in that number, 6259126, and you'd be able to
12 see the history of that account?
13     MS. EVANS: Objection; calls for
14 speculation.
15  A. Yes.
16  Q. (BY MR. NOTZON) Okay. And it would be there
17 still today?
18     MS. EVANS: Objection; calls for
19 speculation.
20  A. I would like to clarify.
21  Q. (BY MR. NOTZON) Sure.
22  A. It would show historical data of anything that
23 was put into the system. That doesn't mean that it's
24 all encompassing of the system. You know, it's -- the
25 data is only as good as what's put into the system.

82
1   Q.  Right.  It doesn't necessarily reflect
2  everything that happened on that contract.  It just has
3  everything that's in the system?
4   A.  No, that's not what I said.
5   Q.  Okay.  I'm sorry.
6   A.  What I said was that the data that's in the
7  system in Salesforce.com is the integrity of that is
8  only as good as the data that was put in.  If there was
9  a contract generated, then that could be a matter of
10 record within Salesforce.
11  Q.  Okay.
12  A.  That does not mean that it's accurate.  That
13 does not mean that, you know, it's what the customer
14 application called for.
15  Q.  I think that's what I said, but that's okay.
16 I'll take your re-explanation is fine.  And could you
17 search that by putting in the opportunity number.
18 That's one to search that event, correct?
19      MS. EVANS:  Objection; calls for
20 speculation.
21  A.  Yes.
22  Q.  (BY MR. NOTZON) And then is another way to
23 plug in Mr. Castano and ask for all accounts that he's
24 worked on?
25      MS. EVANS:  Objection; calls for

83
1  speculation.
2   A.  No.  Not through the history of -- at least to
3  the best of my knowledge.  You couldn't put in Hector
4  Castano and pull up everything he's done in the system,
5  to the best of my knowledge.
6   Q.  It's a database, isn't it?
7   A.  It is.
8   Q.  And if you have a factor in the database like
9  an opportunity number, you can put in that opportunity
10 number and everything that happened on that a
11 opportunity number can be brought up?
12      MS. EVANS:  Objection; calls for
13 speculation.
14  A.  That is my understanding.
15  Q.  (BY MR. NOTZON) Okay.  And do you not have the
16 same understanding that no matter which item you pull
17 up, the rep, the company name, or the opportunity
18 number, you could get the history on that item?
19      MS. EVANS:  Objection; calls for
20 speculation.
21  A.  I can't say for certain.
22  Q.  (BY MR. NOTZON) Okay.  You never did it that
23 way.  You only used the numbers?
24  A.  The opportunity number.  And that's why in the
25 spreadsheet, the opportunity number is there.

84
1   Q.  Okay.  Because you'd like as taking your
2  spreadsheet, which Exhibit 4 is a small part of, if you
3  wanted to go to Salesforce to look up additional
4  information, that would be the way -- the most efficient
5  way to do it through the opportunity number?
6   A.  At my level of experience and my
7  understanding, yes.
8   Q.  Good clarification.
9       MS. SHIPP:  Can we take a short break?
10      (Recess from 12:31 p.m. to 12:37 p.m.)
11  Q.  (BY MR. NOTZON) All right.  So back on
12 Exhibit 4, looking at those numbers the closed won
13 monthly recurring MRCs.
14  A.  Uh-huh.
15  Q.  What -- so that one for the Best Western
16 Bastrop for Castano, the 132099.
17  A.  Uh-huh.
18  Q.  Is that -- what -- that's the commission
19 amount?
20  A.  No.
21  Q.  Okay.
22  A.  That's the monthly recurring revenue and it's
23 a -- it's the total of the products and services that
24 are being provided to that customer and that's what
25 their monthly recurring exclusive taxes, fees, and

85
1  everything, just the base monthly recurring charges.
2   Q.  Does that tell you that's a new construction,
3  that amount of money?
4   A.  No, it doesn't.  That doesn't signify that,
5  no.
6   Q.  Okay.  Do large number signify new
7  construction as opposed to smaller numbers?
8   A.  Not necessarily, no.
9   Q.  Can you have a small number new construction?
10  A.  Could.  Unlikely, but you could.
11  Q.  Typically, new construction's going to be the
12 larger ticket items?
13  A.  Not necessarily.  New construction can be a
14 small product set.  It varies based upon the
15 application.
16  Q.  Okay.  Whether it's a renewal or it could be a
17 big huge renewal?
18  A.  That's correct.
19  Q.  Okay. It's a small hotel and all of a sudden
20 they wanted all the bells and whistles a couple of years
21 later?
22  A.  Could be.
23  Q.  Okay.  So looking at Exhibit 4, there's no way
24 to know which of these accounts are new construction and
25 which are existing accounts?

**Page 86**

1  A. By virtue of them being on the renewal tab, if
2  you look in the gray area, it says renewal closed won.
3  That was top left-hand corner.
4   Q. Got you.
5   A. That was -- this whole thing is one separate
6  tab that is used specifically for renewal tracking
7  purposes.
8   Q. Okay.
9   A. There is the exact same spreadsheet that would
10 show new closed won on a separate tab.
11  Q. Okay. So we know that none of these are new
12 construction?
13  A. If they were entered in correctly, that is
14 correct.
15  Q. Okay. Is that because -- so you could have a
16 customer at this location -- at location A and then they
17 want to build at location B. That's going to be a new
18 contract. That won't be a renewal with an expansion; is
19 that right?
20  A. If we -- the policy at the time I believe, you
21 know, at the time I left. Let me put it that way. Was
22 that if they did not have any services at location B,
23 that would be a new customer opportunity.
24  Q. Okay. Here's No. 5. So if you could go
25 back -- well, feel free to look at it. I'm just going

**Page 87**

1  to start asking questions at 1489.
2       (Exhibit 5 marked)
3   A. 1489.
4   Q. (BY MR. NOTZON) The little number.
5       MR. GROVER: Number down here.
6   A. Okay.
7   Q. (BY MR. NOTZON) All right. So at page 1489
8  there's the new upgrade closed won tab that you were
9  talking about, correct?
10  A. Correct.
11  Q. Okay. So these are going to be -- what's the
12 difference between new and upgrade?
13  A. So new is exactly that. It's a nonexisting
14 customer at a location. In other words, as we talked
15 about location B, customer has zero services there, that
16 would be new. Upgrade could be incremental lift. In
17 other words, existing customer has, you know, $500 in
18 billing. They want additional services. The
19 incremental lift on that would be -- and it was $2,500
20 the incremental lift would be $2,000. So this is
21 encapturing existing customer upgrade revenue. It's the
22 incremental lift in revenue. And then certainly new is
23 exactly that. It's new.
24  Q. Like if they had phones and then they wanted
25 to add TV?

**Page 88**

1   A. They may be one example.
2   Q. Okay. Or completely new construction?
3   A. Correct.
4   Q. Okay. And then if we look at the Salesforce
5  opportunity number, the statement says national down
6  there by the Holiday Inn Temple. What does that
7  indicate?
8   A. This means that this is -- there was out of
9  the other session. There were multiple sessions of
10 Salesforce. Salesforce on a national -- for the
11 national sales teams, they had a separate session of
12 Salesforce that you would literally have to log out of
13 the regional Salesforce, log into the national
14 Salesforce number or Salesforce session. And they had a
15 different convention in terms of, you know, they have
16 Salesforce ID opportunity number; but we weren't always
17 able to get those. We weren't always able to access.
18      So it's even further convoluted by as
19 things continued, specifically in the hospitality space,
20 a lot of the major flags consolidated their buying
21 channel to specific areas within the company. If the
22 property that was being sold was in our geography, we
23 would work through that individual to sell those
24 opportunities. They, then, would administer to the
25 national session of Salesforce.com. We were not always

**Page 89**

1  privy to the Salesforce ID and/or not in a timely
2  fashion, for the purpose of inputting Salesforce IDs
3  into the spreadsheet.
4   Q. How were these names and opportunities
5  organized in the spreadsheet of yours?
6   A. They're literally just put in by the
7  individual representatives.
8   Q. So it's first come, first serve?
9   A. Correct. Only one person can be in the
10 spreadsheet at a time. They input their data, their
11 information. They save. They get out. The next person
12 can get in.
13  Q. And they fill in the next open line?
14  A. Correct, correct.
15  Q. Okay.
16  A. And then when I go in, which I did multiple
17 times a day. I can go in and sort and slice and dice
18 the data. I built these sheets. I can go in and
19 extract my information. I additionally built summary
20 pages off of the data that was being input in here. So
21 I did not have to go into these and sort these
22 particular sheets, but they fed the summary sheets that
23 I built in the workbook.
24  Q. Okay. So through your macros?
25  A. Called longhand, shorthand; but, yes,

90

1  essentially the same.
2     Q.  Okay.  And this is AMs and MAEs both?
3     A.  That is correct.
4     Q.  And so if you look at the Hilton Garden Inn
5  for Mr. Castano on 1489, that's the largest MRC at
6  $2,796.  That's a hefty monthly income, right?
7          MS. EVANS:  Objection; misstates the
8  evidence.
9     A.  No.
10    Q.  (BY MR. NOTZON) Is that -- can you say that's
11 a new construction?
12    A.  I'm unable to tell.  I mean, it's on the new
13 upgrade; but without access to Salesforce, I can't
14 definitively say.
15    Q.  Okay.  Okay.  Exhibit 6.  So that's the
16 difference between No. 6 and No. 5?
17         (Exhibit 6 marked)
18    A.  It would appear they're different fiscal
19 months.  So if you look at -- that's the forecasted
20 close date.  I can't -- I can't definitively say because
21 I don't know what periods these are from.  I can speak
22 in generality because they are the forecasted close
23 dates; but without the date stamp on these, I can't tell
24 specifically what fiscal periods these are from.
25    Q.  (BY MR. NOTZON) So when you say date stamp,

91

1  you're talking about the dates that these were actually
2  entered into the spreadsheet?
3     A.  No.
4     Q.  Or what?
5     A.  The spreadsheets were set up to run consistent
6  with our fiscal monthly periods.  And so it would be,
7  you know, I mean, this is we've got forecasted dates in
8  here.  I do see a lot of 5/18, which would have been the
9  end of our fiscal period so that would have been a May,
10 2016 timeframe, based upon that information.  But
11 without actually having the specific spreadsheet, I
12 can't say for absolute certain.
13    Q.  Okay.  And how does a forecast determine --
14 well, I guess, going back to five is also -- that's a
15 forecast, I apologize.
16    A.  If you look at the top right-hand corner.
17    Q.  Right.
18    A.  These are forecasted.  Remember I said there
19 were four tabs in the workbook.
20    Q.  Let's go to No. 5, 1489, the new upgrade close
21 one, those are historical numbers -- is that right --
22 those actually happened?
23    A.  New upgrade closed won, they were reported.
24 These were input by the team members as closed won deals
25 with all the pertinent data at the end -- towards the

92

1  last week of the fiscal period, I would go through this
2  workbook and cross reference it against Salesforce.com
3  to validate these orders were, in fact, closed won.
4  That there was also another condition within Salesforce
5  that was rejected and in which case the rep and/or
6  myself would need to work on that to get it cleaned up
7  and get it through the system.  But I would do that in
8  the last week of the month to make sure that when we
9  closed that fiscal period, I was confident of our
10 numbers being reported.  I knew if there were any deltas
11 between what Salesforce reported and what we were
12 reporting and we would address that.
13    Q.  Okay.  And then for forecasting, how are those
14 numbers determined?
15    A.  So those numbers are based upon rep input,
16 what they think they will close.  And there's criteria
17 that the company has put out as to what qualifies for
18 forecasted opportunities within a given fiscal period.
19    Q.  Here's No. 7.  And so this is renewal closed
20 won.  And, again, there's no way to new -- if these are
21 if these are -- no.  Next question.
22         The two national designations, that
23 doesn't help us understand how these opportunities were
24 obtained?
25         (Exhibit 7 marked)

93

1     A.  Not necessarily, no.
2     Q.  (BY MR. NOTZON) And all the ones that we've
3  looked at, I understand from the presentation of Charter
4  to me of these documents that we've been talking about,
5  that they come from the first half of 2016.  Do any of
6  these that you've seen remind you of any situations
7  where you provided the leads to these salespeople?
8     A.  No.
9     Q.  Isn't it accurate that as the team supervisor,
10 that leads would come to you from different sources and
11 you would assign them out to your team?
12    A.  Leads would almost never come to us.  A
13 frustration point within the hospitality space
14 specifically because there was an inside team that took
15 calls, inbound calls and inquiries and we very rarely
16 ever got any leads from them.  The MAEs were out
17 prospecting new logos, new revenue opportunities.  So
18 the notion of passing leads out and around, virtually
19 nonexistent.
20    Q.  Once a year, once a month?  When you say
21 virtually nonexistent, what kind of, like --
22    A.  I don't remember specifically.
23    Q.  Okay.  Would once a year be virtually
24 nonexistent?
25    A.  Yes.

94

1  Q.  Would once a month be virtually nonexistent?
2  A.  Two or three times a year.
3  Q.  Okay.  Thanks.  Do you recall a issue that
4  Ms. Shipp had in not being provided with the ability to
5  work a south wide Southwest deal that was given to
6  Hector Castano in 2016?
7       MS. EVANS:  Objection; is best evidence.
8  Q.  (BY MR. NOTZON) Safari Telecom?
9  A.  We provided Southwest services multiple years.
10 Q.  That doesn't ring a bell for you, that
11 Ms. Shipp felt she should have been given that
12 opportunity?
13 A.  I don't remember the specifics of it.
14 Q.  Okay.  What about the term Eloqua?  Do you
15 remember that customer?
16 A.  No.
17 Q.  I'm going to show you Exhibit No. 8.
18      (Exhibit 8 marked)
19      MS. EVANS:  And, for the record, I'm just
20 going to object to questioning this witness about a
21 document that there's no evidence that he was sent or
22 that he's seen before.
23 A.  Okay.
24 Q.  (BY MR. NOTZON) Does Exhibit No. 8 refresh
25 your recollection about the Eloqua deal?

95

1  A.  No.  I still don't know -- that Eloqua rings
2  no bell at all.
3  Q.  Okay.  And rule of engagement red flag on one
4  time events, do you remember that controversy?
5  A.  One of many.
6  Q.  Okay.  And that was resolved in Ms. Shipp's
7  favor?
8  A.  According to this, yes.
9  Q.  But you don't recall it?
10 A.  Specifics, again, one of many roles of
11 engagement infractions.
12 Q.  By?  Who's conducting -- who's engaging in the
13 infraction?
14 A.  It was part of verticalization within the
15 company.  Enterprise was defined very specifically by
16 vertical.  It was prior to verticalization, teams were
17 allowed to sale into these verticals.  Once we
18 verticalized, we, the company across the country
19 verticalized, we went through a process of having to
20 extract SMBs, small medium business representatives, out
21 of that space.  And it was a culture change so that
22 the -- because the verticals were protected from other
23 sales area within the company.
24      That's said, in that process and
25 re-culturing, if you will, we were in a constant lookout

96

1  and constant battle with representatives outside the
2  company that were, you know, a squirrel trying to make a
3  nut -- a sale.  And so it was a common thing for us to
4  have these violations and have to get them resolved.
5  Typically, they were handled manager to manager.  If
6  they couldn't be resolved there, it was escalated up.
7  Q.  So this isn't a Stephanie Shipp specific
8  thing.  This is among all salespeople?
9  A.  Yes, my observation.
10 Q.  When you said one of many, I wanted to make
11 sure that you're not attributing it to just Ms. Shipp.
12 A.  No, no.
13 Q.  And do you recall giving Mr. Castano these
14 contracts, these opportunities that are listed here in
15 Exhibit 8?
16 A.  Safari Telecom I absolutely did.  Safari
17 Telecom is a national account that we were penetrating.
18 We had dealt with Safari Telecom.  The folks dealt
19 downstairs in violation had dealt with Safari Telecom.
20 As part of that resolution, I worked with the director
21 downstairs and got Safari Telecom gradually moved over
22 to our vertical.  I had also worked with Safari Telecom
23 personally on -- I'm not a golfer so bear with me -- but
24 we did the golfing event up in Dallas and I had worked
25 with them up there.

97

1       The purpose and the reason that I gave it
2  to Hector was that I wanted him to pursue that and
3  develop that relationship with Safari Telecom because
4  they do one-time events, not just the -- not just the
5  event that is in question here.
6  Q.  Okay.  And why Hector for one-time events and
7  not Ms. Shipp?
8  A.  New guy on the block, see what he can do with
9  it.  I mean, it's, again, at my discretion or the
10 manager's discretion to allocate accounts and test for
11 the new guy.
12 Q.  Do you recall anyone else taking FMLA leave
13 under you other than Ms. Shipp and Ms. Broam?
14 A.  Could have, but I don't remember.
15 Q.  Okay.  Do you recall pressuring anyone while
16 they're on FMLA leave or coming back from FMLA leave to
17 conduct sales to keep their quotas going?
18 A.  No, because there's a company-mandated ramp
19 policy that extends.  I think it's -- it depends on the
20 position, but I think it's anywhere from four to six
21 months they're on ramp coming off of FMLA.
22 Q.  Okay.  And when does that kick in, that
23 policy?
24 A.  On the date of return.  I think it's -- I
25 don't want to specify.  That's company policy, and it's

110

1  Q. (BY MR. NOTZON) And where else would they be?
2     MS. EVANS: Objection; calls for
3  speculation.
4  A. I can't say specifically. I don't know.
5  Q. (BY MR. NOTZON) Where might they be?
6     MS. EVANS: Objection; calls for
7  speculation.
8     MR. GROVER: Same objection.
9  A. I don't know.
10 Q. (BY MR. NOTZON) Well, you've been a manager
11 for a long time. Where would you look for the
12 supporting information?
13 A. I would look in Salesforce.com.
14 Q. Okay. And it wouldn't be unheard for this
15 deal to have been started in the beginning of 2016?
16    MS. EVANS: Objection; calls for
17 speculation.
18    MR. GROVER: Same objection.
19 A. It would not be unheard of.
20 Q. (BY MR. NOTZON) Do you recall after Ms. Shipp
21 left Charter, that you commented at work that that ship
22 had sailed?
23 A. I don't recall.
24 Q. Would that be language you would use?
25 A. Don't know.

111

1  Q. Do you recall being pleased that Ms. Shipp had
2  quit?
3  A. I don't recall.
4  Q. Do you remember being pleased that Ms. Broam
5  had quit?
6  A. I don't recall.
7  Q. Let's take a short break.
8     MR. NOTZON: Is that okay?
9     MR. GROVER: Yes.
10 Q. (BY MR. NOTZON) Okay. Mr. Matthews, what did
11 you do to prepare for your deposition today?
12 A. I met with my attorney.
13 Q. Okay. Mr. Grover?
14 A. Yes.
15 Q. Okay. And how long was that meeting?
16 A. Hour and a half.
17 Q. And when was that?
18 A. Last week.
19 Q. Okay. Did you go over any documents?
20 A. No.
21 Q. Okay. Did you have any discussion with anyone
22 else?
23 A. No.
24 Q. Was anyone else on the phone while you were
25 meeting with Mr. Grover?

112

1  A. Not to my knowledge.
2  Q. Have you had any conversations with Charter's
3  attorneys?
4  A. I spoke with Delilah Evans.
5  Q. When --
6     THE WITNESS: Delilah, I'm sorry. What's
7  your last name?
8     MS. EVANS: Evans. You're correct.
9  Q. (BY MR. NOTZON) When?
10 A. Over roughly two weeks ago.
11 Q. And what was the contents of that
12 conversation?
13 A. A question-and-answer session that's about it.
14 Q. Who was asking the questions?
15 A. Delilah.
16 Q. What were the questions?
17    MS. EVANS: I'm going to object to the
18 basis of privilege.
19    MR. GROVER: So don't answer that
20 question.
21 A. This is me being quiet.
22 Q. (BY MR. NOTZON) Do you recall telling
23 Ms. Shipp that if she lost some weight, the heat
24 wouldn't bother her so much?
25 A. No.

113

1  Q. Do you ever remember commenting on Ms. Shipp's
2  weight?
3  A. No.
4  Q. Did you ever yell or -- yeah, let's say that.
5  Did you ever yell at any employee at work, one of your
6  subordinates, that is?
7  A. Not that I can recall.
8  Q. Are you -- have you been made aware of the
9  trial date in this case?
10 A. No.
11 Q. Do you understand the trial is set in Austin,
12 Texas?
13 A. No.
14 Q. Are you planning on attending trial in this
15 case?
16 A. No.
17 Q. Are you intending on providing a sworn
18 statement in this case?
19    MR. GROVER: Objection; calls him to
20 speculate about future requests or his action.
21    MR. NOTZON: He's welcome to do that
22 about his own mind.
23 A. No.
24    MR. NOTZON: All right. I'll pass the
25 witness.