# EX. 28

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STEPHANIE SHIPP, | § § § | |
| *Plaintiff,* | § § | |
| V. | § § | CIVIL ACTION NO. 1:18-cv-00760-LY |
| | § § | |
| CHARTER COMMUNICATIONS, INC. | § § | |
| *Defendant.* | | |

_____

**DECLARATION OF KRISTINE LAWRENCE**
_____

My name is Kristine Lawrence. I am over 18 years of age, of sound mind, and am competent and capable of making this declaration. The facts stated herein are within my personal knowledge and are true and correct.

1. I am currently a Director of Human Resources for Charter Communications, Inc. I was previously a Manager of Human Resources for Time Warner Cable for twelve years before its May 2016 merger with Charter Communications. Throughout 2016, I supported the outside business sales organization, which included Chris Matthews' hospitality sales team in Texas. At that time, I reported to Senior Director of Human Resources Tammy Zimmerman.

2. Stephanie Shipp was a Major Account Executive on Mr. Matthews' team in 2016. In January 2016, a geographical realignment occurred throughout the then-Time Warner Cable sales organization that impacted the hospitality sales team in Texas. In particular, Texas was split into two geographic regions: (1) North Texas to be overseen by Manager Steve Johanknecht and (2) Central & South Texas to be overseen by Mr. Matthews. This geographic realignment resulted

in Ms. Shipp and others like her who served the Central and South Texas area to start reporting to Mr. Matthews beginning on January 22, 2016.

3. Previously, the Texas hospitality sales team had been divided, not geographically, but rather between Major Account Executives reporting to Mr. Johanknecht and Account Managers reporting to Mr. Matthews. Because Ms. Shipp was a Major Account Executive in 2015, she thus reported to Mr. Johanknecht at that time.

4. I had several conversations with Ms. Shipp in February and March 2016 regarding her move from Mr. Johanknecht's team to Mr. Matthews's team and her overall interaction with Mr. Matthews. Although she told me during our conversations that she wanted to move back to Mr. Johanknecht's team, she never mentioned or suggested that she wanted to do so because Mr. Matthews had discriminated against her in any way. She also never suggested that Mr. Matthews was treating her differently in comparison to her coworkers—whether because she is a woman, because of her age, because she took just over a week of FMLA leave, or for any other reason, be it EEO-related or not. Instead, Ms. Shipp's concerns focused solely on the different management style that Mr. Matthews displayed in comparison to her previous manager, Mr. Johanknecht.

5. During these February and March 2016 conversations, Ms. Shipp did express her feeling that Mr. Matthews was being a bully, appeared impatient with her, and used a tone of voice she did not like. Her complaints though were in the context of Mr. Matthews requiring her, along with the rest of his team, to complete a weekly Excel spreadsheet reflecting sales forecasts. Although I do not remember Mr. Shipp's exact wording as to her complaint about Mr. Matthews' tone, I do recall that she felt Mr. Matthews talked down to her. However, she never once told me that Mr. Matthews had yelled at her. She likewise never told me that Mr. Matthews had slammed a desk, wall, or anything else in anger. She also never told me that Mr. Matthews had made any

negative comments about her weight, her gender, her age, her use of FMLA leave, or anything else similar. I can say this affirmatively, because if Ms. Shipp had made me aware of any such comments or slamming of desks or walls, I would have investigated it further and addressed it with Mr. Matthews. Similarly, if Ms. Shipp had ever indicated her concerns about Mr. Matthews related to an EEO category or characteristic (like gender, age, or use of FMLA leave), I would have referred the matter to Employee Relations for further handling.

6. From the context of my conversations with both Ms. Shipp and Mr. Matthews in February and March 2016, it appeared they had a personality conflict that led to poor communication. I thus decided to hold a mediation session with the two of them in an effort to improve their communication and working relationship. Because I office in Charlotte, North Carolina, I attended this mediation session by phone while Mr. Matthews and Ms. Shipp appeared together in person in Austin, Texas.

7. From my perspective, the mediation session held on April 5, 2016, went well and ended on a positive and hopeful note. I believed it was successful in resolving Ms. Shipp's work-related concerns because Ms. Shipp never contacted me again—that is until she sent an email resigning her employment in the early morning hours of June 7, 2016.

8. On April 18, 2016, I was forwarded Ms. Shipp's complaint to Charter's Ethics Department regarding a comment Mr. Matthews had made on someone else's personal Facebook post the year prior. This was the first time I knew or heard anything about this Facebook post. Ms. Shipp had not mentioned it to me in any of our prior conversations. She likewise never complained about the person responsible for the original Facebook post, Darrell Seybold. To the contrary, during our February and March conversations, she had told me that she had a good working relationship with Mr. Seybold and had "loved" reporting to him.

9. Because of the nature of Ms. Shipp's complaint, I deferred its handling to the Ethics Department and took direction as provided from that Department thereafter. In accordance with the direction I was given, I, along with their Directors, spoke to both Matthews and Seybold. I was not directed to take any further action.

10. Although Ms. Shipp resigned her employment on June 7, 2016, Ms. Shipp never once received any corrective action from Mr. Matthews. At no time between January 2016 and June 2016 did Mr. Matthews send me any draft or proposed documented coaching, written warning, or any other type of corrective or disciplinary action, which he would be required to do under the applicable policies and procedures at the time. Ms. Shipp's position and essential job duties also remained the same throughout this nearly six month time period that she reported to Mr. Matthews.

11. As for Debbie "Sunny" Broam, she too never contacted me about any EEO-type of concerns. Ms. Broam instead contacted me only about quota relief for the time she was out on FMLA leave and the return of her sales accounts and opportunities that had been moved to other salespeople while she was out on FMLA leave. As I learned and communicated to Ms. Broam, she received quota relief due to her time away as determined by Charter's Sales Operations Department. Neither Mr. Matthews nor anyone else in Ms. Broam's management chain had any input on the quota relief Ms. Broam received.

12. As for her sales accounts, Mr. Matthews returned most if not all that had be assigned to others within days of Ms. Broam's return from leave. However, around this same time period, Charter's Sales Science Department had created a new sales modules, which meant for Ms. Broam that her new module contained a mix of pre-FMLA leave accounts and opportunities along with

some new accounts and opportunities. The creation of her new sales module was not at the behest of Mr. Matthews, but rather was in accordance with the company's regular practice.

13. During my time supporting the sales organization, I have learned that sales accounts and opportunities are moved from one salesperson to another for a variety of business reasons. One of those reasons can be due to a salesperson taking an extended leave of absence. In that circumstance, sales accounts and opportunities are typically moved back to the originally assigned salesperson upon the return from leave, but there are occasions when that does not occur.  A couple of examples of those occasions are when a strong relationship has developed between the client and the new sales representative or the client requests the new sales representative remain involved.

14. One of the purposes of Charter's Sales Science Department is to monitor the sales modules, which consist of a mix of sales accounts and opportunities, to ensure equal distribution within the various sales teams. If the sales modules for a particular sales team are not as equally distributed as they should be, then the Sales Science Department can shift accounts and opportunities around. After Ms. Broam raised concerns to me about her sales accounts, I spoke with the Sales Science Department and was advised that there was nothing abnormal with or concerning about Ms. Broam's sales module following her return from FMLA leave.

15. As with Ms. Shipp, not once during these discussions in April 2016 did Ms. Broam ever advise, mention, or insinuate to me that Mr. Matthews was treating her differently based on her gender, age, or any other EEO characteristic or category.  She also never told me that she felt discriminated against in any way or that Mr. Matthews had yelled at her, slammed his hand on anything, made any inappropriate comments about her or anyone else, or wrongly moved her from being a Major Account Executive to an Account Manager.

16. As for her title change, I was aware that Ms. Broam had struggled with her sales performance ever since she was first hired in 2015. Thus, I believed her title change, which occurred in April 2016 and resulted in no change to her base salary, as beneficial to Ms. Broam because her monthly sales quota was reduced by half, making it much easier to achieve.

17. In July 2016, I understand Ms. Broam raised some EEO concerns to my superior, Ms. Zimmerman. As Ms. Zimmerman informed me, she sent Ms. Broam's concerns to Charter's Employee Relations Department for investigation. Based on the report I later reviewed in August 2016, Ms. Broam's concerns were unsubstantiated.

18. I declare under penalty of perjury that the foregoing paragraphs, 1 through 17, are true and correct.

Executed on October 1, 2019.

*Kristine Lawrence* (signature)
KRISTINE LAWRENCE